Theodore F. **JACOBS**, Plaintiff,

v.

Jerry M. **TENNEY** et al., Defendants.

Civ. A. No. 3795.

United States District Court,
D. Delaware.

Aug. 13, 1970.

As Amended Aug. 14, 1970.

Russell J. Willard, of Hastings, Taylor & Willard, Wilmington, Del., Lewis M. Dabney, Jr., Herbert Robinson and Liebman, Eulau, Robinson & Pearlman, New York City, of counsel, for plaintiff.

Joseph A. Rosenthal of Cohen, Morris & Rosenthal, Wilmington, Del., Michael Lesch and Ira Postel of Shea, Gallop, Climenko & Gould, New York City, of counsel, for defendants Omega Equities Corp., Jerry M. Tenney, Shirley Tenney, Richard S. Hull, Jack Morganstern, Abraham Traub, Leonard Kingstone and Irving Schuyler.

Thomas S. Lodge of Connolly, Bove & Lodge, Wilmington, Del., and John E. Halpin, New York City, of counsel, for defendant Pennsylvania Mutual Fund, Inc.

David A. Drexler and Richard S. Paul of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants Mates Investment Fund, Inc. and Ocean Technology Fund, Inc.

John Mulford of Theisen, Lank & Kelleher, Wilmington, Del., and Richard M. Meyer of Pomerantz, Levy, Haudek & Block, New York City, of counsel, for defendant Kleiner-Bell & Co., Inc.

Ralph F. Keil, of Keil & Keil, Wilmington, Del., for defendants Arthur Jarwood, Phillip Kasenove and Nathan Shapiro.

Max S. Bell, of Richards, Layton & Finger, Wilmington, Del., and Robert L. Beerman of Morrison, Paul & Beiley, New York City, of counsel, for defendant Theodore M. Lakos.

Henry M. Canby and Richard F. Balotti, of Richards, Layton & Finger, Wilmington, Del., for defendant Meyerson & Co., Inc.

Max S. Bell of Richards, Layton & Finger, Wilmington, Del., and Burton H. Brody of Jezer, Slade & Weiss, New York City, of counsel, for defendants Erwin Bernstein and Leonard Cohen.

## OPINION

LATCHUM, District Judge.

This stockholder's derivative action, instituted by Theodore F. Jacobs on be-

half of and for the benefit of Omega Equities Corporation (:"Omega"),[1] seeks the recovery of damages and equitable relief for wrongs allegedly sustained by Omega as a result of Omega's expansion between April and December, 1968 in acquiring various enterprises and interests, financed through the sale and exchange of Omega's unregistered letter stock. The complaint identifies four principal categories of defendants: (1) eight officers and directors who served Omega during the period in question (the "officer-director defendants") ;[2] six brokers and dealers in securities who assisted in selling Omega letter stock and also allegedly purchased letter stock for their own account (the "broker-dealer defendants") ;[3] five open-end mutual fund investment companies, registered with the Securities and Exchange Commission, who purchased letter stock of Omega (the "mutual fund defendants") ;[4] and (4) twenty-nine others who are alleged to have sold property and assets to Omega at unconscionably high prices, in constructive fraud of Omega (the "vendor defendants").[5] The complaint generally alleges that the various wrongs complained of "were effected pursuant to scheme and conspiracy between the officer-director defendants and the broker-dealer and mutual fund defendants." The allegations of the complaint may be summarized as follows:

Omega, a Delaware corporation, was until April, 1968 engaged primarily in the purchase, sale and management of real estate. According to the allegations of the complaint, in April, 1968, the officer-director defendants, dominated and controlled by Jerry M. Tenney, planned to convert Omega into a conglomerate with holdings in various fields. In May, 1968 a public relations firm was retained to disseminate publicity regarding Omega's acquisition program and its development into a conglomerate corporation. The complaint further charges that in April, 1968 the officer-director defendants, the mutual fund defendants and the broker-dealer defendants entered into a conspiracy to buy and sell Class A shares of Omega which were not registered with the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933 (the " '33

1. A Delaware corporation.

2. The eight officer-director defendants named are: Jerry M. Tenney, Harry W. Bank, Richard S. Hull, Jack Morgenstern, Abraham Traub, Leonard Kingstone, Irving Schuyler and Arthur Jarwood. Bank has not appeared; Jarwood has appeared generally. The other officer-director defendants have moved to dismiss for improper venue and improper service. Shirley Tenney, the wife of Jerry M. Tenney and record holder of 500,500 shares of Class A Omega stock, has also been joined as a defendant upon the allegation her ownership is only to conceal the actual ownership and control of the stock by her husband. Shirley Tenney has joined in the same motions of her husband and taken the same position as the officer-director defendants.

3. The broker-dealer defendants are: Theodore M. Lakos, Meyerson & Co., Inc., Leonard Cohen, Erwin Bernstein, Kleiner-Bell & Co., Inc., and John B. Licota & Co. All of these defendants have filed various motions except John B. Licota & Co. which has not appeared.

4. The mutual fund defendants are: Mates Investment Fund, Inc., Pennsylvania Mutual Fund, Inc., Ocean Technology Fund, Inc., Essex Fund, Inc., and Golden Gate Fund, Inc. All mutual fund defendants have filed various motions except Essex Fund, Inc. and Golden Gate Fund, Inc., who have not appeared.

5. The named vendor defendants are: Arthur Jarwood, Phillip Kasenove, Nathan Shapiro, Wayne Copeland, Solbar Eastern Corporation, Bertha Mae Copeland, J. H. Mitchell, Jr., William Raff, Robert F. Heller, Robert Mellin, Inc., Robert Music, Inc., Algonquin Music, Inc., Sherwin Music, Inc., Elmwin Music, Inc., Robert Mellin, Stasney Music Corp., Daniel Kursman, Leon Breslow, Carol Breslow, Alfred Segal, Lila Segal, Alice Arm Mining, Ltd., Vernon E. Shelton, Leo Bromberg, Thomas Garrett, Edward Silvers, Arnold Handzel and Jack Miller. Of the vendor defendants, only Arthur Jarwood, Phillip Kasenove and Nathan Shapiro—vendors of the stock of Raleigh Manufacturers, Inc. to Omega—have appeared and filed various motions.

Act"), 15 U.S.C. § 77a et seq. Such unregistered shares were issued by Omega as letter stock, i. e. the purchaser would sign a letter stating the stock was purchased only for investment and not for public distribution and the certificates of stock carried a legend restricting the sale of the stock pending registration with the Commission. It is further charged that as a primary inducement to the purchase of this stock, the officer-director defendants caused Omega to make commitments for the sale thereof at prices 50% below the then current retail price for Omega stock in the over-the-counter market. Sale commitments were made between six weeks to two months before the sales were consummated and on many dates of the sale, the letter stock prices frequently were as low as 20 to 25% of the quoted over-the-counter market prices for registered shares. Between May 15 and December 20, 1968, Omega letter stock was sold at prices ranging from $3 to $10 per share. In all, over 3 million shares of Omega were sold for which Omega received gross proceeds of over 12 million dollars.

Included in the 3 million shares sold during this period were 513,000 shares of letter stock sold to the mutual fund defendants [6] and 1,793,100 shares sold to 186 purchasers by or through the broker-dealer defendants.[7] The officer-director defendants authorized Omega to pay a share commission or finders fee of 25¢ for each share sold by the broker-dealer defendants. The complaint charges that the broker-dealer defendants, during the period from May 15, 1968 through December 20, 1968, while engaged in underwriting and distribution of the Class A Omega stock, "bid for and effected transactions in such stock and recommended and effected transactions in the stock for their customers and others." In addition, the broker-dealer defendants are charged with purchasing and selling on their own account in the over-the-counter market substantial blocks of Omega stock, in violation of § 10(b) of the Securities Exchange Act of 1934 (the " '34 Act"), 15 U.S.C. § 78j(b) and Rules 10(b)–6, 15(c)–1 & 2 and 15(c)1–6 promulgated pursuant to § 15(c) of the '34 Act, 15 U.S.C. § 78o(c).

The second count of the complaint charges that in the conduct of the acquisition program between April and December, 1968, the officer-director defendants violated both their fiduciary duties under Delaware law and various provisions of the Federal securities laws. The acquisition program involved total cash expenditures of $5,500,000 and also the exchange of Class A shares of Omega in return for the properties acquired. The second count specifically charges that the prices paid to the vendor de-

6.

| Fund | No. of Shs. | Price | Total Proceeds Received |
|---|---|---|---|
| Mates Investment Fund, Inc. | 300,000 | $3.25 | $975,000 |
| Pennsylvania Mutual Fund, Inc. | 100,000 | 3.25 | 325,000 |
| Essex Fund, Inc. | 100,000 | 3.34 | 334,000 |
| Golden Gate Fund, Inc. | 6,500 | 5.50 | 35,750 |
| Ocean Technology Fund, Inc. | 6,500 | 5.50 | 35,750 |
| | 513,000 | | 1,705,500 |

7.

| Broker | No. Shares Sold | Commission Paid Broker | No. of Purchasers |
|---|---|---|---|
| Lakos | 618,000 | $ 324,650 | 7 |
| Meyerson & Co., Inc. | 212,600 | 28,948 | 100 |
| Cohen & Bernstein | 200,000 | 10,000 | 15 |
| Kleiner-Bell & Co., Inc. | 450,000 | 75,000 | 25 |
| John B. Licota & Co. | 312,500 | 78,125 | 39 |
| | 1,793,100 | $ 516,723 | 186 |

fendants during this period were unconscionably high and that the assets acquired were of little or no value. For example, Omega acquired the outstanding stock of Raleigh Manufacturers, Inc. for $6,333,000, of which $1,600,000 was paid in cash, with the commitment to pay $4,400,000 of the remaining balance in cash, and deliver to each of the three vendor defendants [8] of Raleigh stock 100,000 shares of Class A Omega stock valued at $1 per share. The assets of Raleigh acquired for $6,300,000 included $5,300,000 of good will and intangibles. The net profit of Raleigh for the fiscal year ending May 31, 1968 was $65,000.

As another example of the eclectic expansion program of Omega's management during the period in question, in October, 1968, Omega acquired from Alice Arm Mining, Ltd. and "Dr." Vernon E. Shelton an alleged underwater robot for 120,000 shares of its Class A stock. It was represented that the robot was able to work underwater to a depth of 1000 feet and that the robot had been developed by the Hughes Aircraft Corporation at a cost of over $1,000,000. Contrary to this representation the complaint alleges that Vernon E. Shelton (who was not a doctor) had acquired the robot as scrap from the salvage department of the Hughes Aircraft Corporation for about $1,500 and the vellum drawings of the device for $250. It was alleged that the robot "was and is essentially worthless." The count states that the acquisition of the various business enterprises was not motivated by usual business judgment but was motivated by a desire to build up as rapidly as possible a public image of Omega as an "emerging conglomerate" without regard to prices paid or value received.

The third count alleges that on December 20, 1968, the Securities and Exchange Commission issued an order suspending trading in the securities of Omega in the over-the-counter market because of the sales of such letter stock. The suspension in trading continued until after April 10, 1969. On April 10, 1969, the Commission filed a complaint in the United States District Court for the Central District of California predicated on the acts and practices related to the sale of the letter stock, and other acts and practices, all of which were alleged to be in violation of Rule 10(b)-5 of the '34 Act and of the registration and anti-fraud provisions of the '33 Act. Included as defendants were Omega and the officers and directors of Omega named as defendants in the present action.

On April 10, 1969, Omega and the officer-director defendants entered their appearance in the California suit and agreed to a consent judgment enjoining Omega and such officer-director defendants from further acts in violation of the Securities Acts. The defendants further agreed, for 120 days after the entry of the judgment, not to issue additional securities, solicit or receive public funds or acquire new properties. In addition, Omega was precluded after the 120 day period from issuing further stock, unless a registration was in effect covering such shares. No registration is now, or has been, effective. The third count prays that the officer-director defendants indemnify Omega against the expenses of the Commission's investigation and litigation and the resulting damages to Omega's reputation and ability to consummate further financing.

The fourth count alleges that various holders of Omega's Class A stock have filed in this and other courts ten individual and representative suits on behalf of themselves and other stockholders similarly situated, to recover sums expended by them in the purchase of Omega's letter shares and for alleged damages which they incurred in the distribution of such shares. Thus, the complaint requests that the officer-director defendants indemnify Omega for all fees, expenses and damages which Omega may incur in the litigation or settlement of such class actions.

---

8. Defendants Jarwood, Kasenove and Shapiro.

The fifth count alleges that Omega issued in implementation of its expansion program 100,000 Class A shares of its stock to defendant Hull and 25,000 shares to defendant Morganstern as a bonus to their employment contracts. Further, it is alleged that Omega sold to defendant Schuyler 200,000 shares of Class A stock for $3.25 per share and subsequently refunded 25¢ per share to Schuyler at a time when the bid price for such shares was quoted at $10.50 or better. Thus, it is said the issuance and sale of these securities were unfair and unconscionable and should be cancelled.

The sixth count alleges that 500,500 shares of Class A stock standing in the name of Shirley Tenney is in part owned by her husband, Jerry M. Tenney, or that Shirley Tenney is not a bona fide purchaser for value or at best is only an assignee who took title with notice of the equitable rights of Omega against Jerry M. Tenney. It is further alleged that the officer-director defendants hold over a million Class A shares of Omega and by reason of their reckless and illegal mismanagement these shares including those held by Shirley Tenney, as well as all sums due and owing by Omega to the officer-director defendants, should be subordinated to the stock held by the public stockholders of Omega.

Jurisdiction is based upon a federal question arising under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and pendent jurisdiction of the common law claims growing out of the same acts and transactions set forth as violative of the '34 Act. The plaintiff seeks a monetary judgment against the officer-director defendants, the broker-dealer defendants, and the mutual fund defendants. In addition, he seeks to cancel all indebtedness of Omega to the officer-director defendants, to rescind the sales made by the vendor defendants to Omega and to cancel all shares and indebtedness incurred by Omega in connection there-with, to subordinate all indebtedness and shares of Omega held by the officer-director defendants and Shirley Tenney, to appoint a receiver for Omega or in the alternative, to enjoin all transactions by Omega outside the ordinary course of business except upon 20 days notice to plaintiff's counsel.

Five principal questions are raised by preliminary motions: (1) the propriety of venue as to certain of the defendants, (2) the propriety of service upon the defendants, (3) the sufficiency of the allegations of conspiracy, (4) the propriety of entering defaults against the non-appearing defendants, and (5) the desirability of a stay or transfer of the present action under 28 U.S.C. § 1404(a).

*Motions To Dismiss For Improper Venue.*

Seven of the officer-director defendants,[9] four of the broker-dealer defendants[10] and two of the vendor defendants[11] first move to dismiss the complaint on the ground of improper venue under the '34 Act. For an alleged violation of the '34 Act, venue is determined under section 27 of the Act, 15 U.S.C. § 78aa. This section provides that an action to enforce any liability or duty created by the '34 Act or rules or regulations thereunder or to enjoin any violation under this Act or of the rules or regulations thereunder may be brought in any district wherein (1) any act or transaction constituting a violation occurred or where the defendant (2) is found (3) is an inhabitant or (4) transacts business. The moving defendants contend that, as to them, none of the possible grounds of venue has been established. The plaintiff, however, urges that the holding of Omega's annual meeting of stockholders in Delaware in April, 1968 and the election at that time of the directors of Omega for the ensuing year were acts sufficient

---

9. Jerry M. Tenney, Hull, Schuyler, Kingstone, Morganstern, Traub, Jarwood and Shirley Tenney.

10. Lakos, Cohen, Bernstein and Meyerson & Co., Inc.

11. Kasenove and Shapiro.

under section 27 to establish venue in this jurisdiction. The plaintiff argues that the principal purpose of the stockholders' annual meeting in April, 1968 was to elect the Board of Directors for the ensuing year, and that the election of the Board at this meeting (and the subsequent election of officers by the Board) "put Tenney in absolute control in anticipation of Omega's program of financing, property acquisitions and other wrongs complained of."

In considering the extent and nature of the contact with a jurisdiction necessary to establish venue under section 27, this Court concluded in Puma v. Marriott, 294 F.Supp. 1116, 1120 (D.Del. 1969) that section 27 "does not require that the violative act or acts form the core of the claim. All that is required is but one act within the forum district which represents more than an immaterial part of the allegedly illegal events." In Dauphin Corp. v. Redwall Corp., 201 F.Supp. 466, 469–470 (D.Del.1962) this Court ruled that acts committed in the jurisdiction which were "integral parts of" or of "material importance to" the commission of the violation of the '34 Act were sufficient to establish venue in this jurisdiction.

Dauphin v. Redwall Corp. implicitly recognized that the act committed in the jurisdiction need not *itself* constitute a violation of the Act in order to establish venue. In *Redwall* the plaintiff purchased from the defendant the note of Pineda Club, Inc., and in payment issued 120,100 shares of Dauphin stock. The complaint alleged that both the note and certain lands, which constituted the only assets of Pineda were fictitiously valued. The Court found that two acts committed within the jurisdiction were "integral parts of the fraud for which all defendants were the intended beneficiaries" and therefore established venue under section 27 in this jurisdiction. 201 F.Supp. at 469–470. These acts were (1) the filing of the corporate charter of Redwall—which the complaint alleged was organized by the individual defendants "with the intention that it be used 'as a conduit for the benefits which [the individual defendants] expected' from the sale of Pineda"—and (2) the filing of the amendment of the Dauphin charter increasing its authorized stock so that at least 120,130 shares of Dauphin would be available to issue to Redwall in exchange for the Dauphin note. Certainly neither the filing of an amendment to the charter of Dauphin— the party allegedly defrauded—nor the filing of the charter of Redwall in Delaware were in themselves violations of the '34 Act or the rules issued thereunder.

In the light of Puma v. Marriott and Dauphin v. Redwall Corp. the only question under section 27 is whether the Act on which venue is predicated is "an integral part of" or "of material importance" to the commission of the violations of the '34 Act. Considering the nature and extent of the acts found sufficient to establish venue in *Puma* and *Redwall*, it appears that the election of directors of Omega in Delaware in April, 1968 was "an integral part" of the commission of the acts alleged to be in violation of the '34 Act.

In Kane v. Central American Mining & Oil, Inc., 235 F.Supp. 559 (S.D.N.Y. 1964) a derivative suit attacked the alleged issuance of a substantial block of the shares of Central American Mining & Oil for no consideration or an inadequate consideration. The complaint alleged that a special stockholders' meeting held in the forum district was designed, *inter alia*, to give defendants control of the corporation. After noting that the congressional purpose in enacting the broad venue provision of section 27 was to provide "an accessible forum for imposing the Act's standards upon multistate transactions in securities," Judge Weinfeld ruled that "[t]he shareholders' meeting in this district, arranged by mail, drawing out-of-state shareholders to this district, and with the alleged purpose of securing to defendants the fruits of their fraudulent scheme" was adequate to sustain jurisdiction and could be deemed "an impor-

tant step in the execution of the fraudulent, deceitful scheme or its consummation." 235 F.Supp. at 565.

The defendants advance several reasons for finding that the annual meeting and election of directors in April, 1968 were not "of material importance" to the commission of the alleged violations of the '34 Act. The first reason, though never fully articulated, appears to be essentially that the holding of the annual meeting and election of directors were only formalities confirming the current status of the directors and of the controlling position of Jerry M. Tenney as the principal shareholder of Omega in April, 1968, and, therefore, not of significance in the commission of the alleged waste and fraud. In support of this contention, the defendants point out that the six directors elected at the April, 1968, meeting were already directors of Omega,[12] and that Tenney's substantial ownership of Omega shares gave him the unquestioned ability to elect a majority of the board of directors in April, 1968.[13]

In spite of the dominant position of the defendant Tenney by virtue of his 90% ownership of Class B stock at the time of the April meeting, the holding of this meeting and the election of directors were not mere formalities, but of material importance to the commission of the wrongs alleged in the complaint.

8 Del.C. § 211(b) provides that an annual meeting of stockholders "shall be held for the election of directors" on a date and at a time designated by or in the manner provided in the by-laws,[14] and under 8 Del.C. § 211(c), if there is a failure to hold the annual meeting for a period of thirty days after the date designated therefor, or, if no date has been designated, for a period of thirteen months after its last annual meeting, the Court of Chancery "may summarily order a meeting to be held upon the application of any stockholder." The holding of the annual meeting in April, 1968 effectively precluded any stockholder initiative in determining the time of an annual meeting for the next thirteen months. Assuming that Tenney maintained his dominant ownership position in regard to Class B shares (with the right to elect two-thirds of the directors of Omega) the summary order of an annual meeting would not jeopardize Tenney's control *per se.* But an annual meeting would provide an important forum for minority shareholders publicly to challenge the wisdom, necessity and legality of the issuance of letter stock by Omega, and the conduct of the acquisition program financed by the sale of the letter stock, all of which are challenged as wasteful and improper in the present action. In summary, the holding of the annual meeting in April, 1968 endowed the directors with lawful authority to operate and administer the corporation during the period when the fraud and waste were allegedly committed, and prevented the possibility of stockholder

---

12. At the April meeting, Jerry M. Tenney, Robert J. Bernard, Richard S. Hull, Jack Morganstern, Eric Emory and Leonard Kingstone were elected directors of Omega. Of these individuals, Tenney was first elected a director in 1960, Bernard in 1966, Hull in 1964, Morganstern in 1966, Emory in 1963 and Kingstone in 1964. Tenney was the President and Chairman of the Board of Omega, Bernard the Executive Vice President and Hull the Vice President and Corporation Counsel.

13. At the time of the shareholders' meeting on April 29, 1968, the charter of Omega provided that Class B shareholders were entitled to elect two-thirds of the company's Board of Directors, and that the Class A shareholders were entitled to elect one-third of the corporation's directors. At the time of the April, 1968 annual meeting, the defendant Jerry M. Tenney held beneficially and of record 9.85% of Omega's Class A stock and 91.67% of the company's Class B stock, which together aggregated approximately 22.05% of Omega's then outstanding voting securities. At that time, no other person owned of record or beneficially as much as 10% of the company's voting securities.

14. The by-laws of Omega have not been made a part of the present record.

challenge to the directors through an annual meeting for the next 13 months. For these reasons, the holding of the annual meeting and the election of directors can fairly be considered "of material importance" to the commission of the alleged violations of the '34 Act.

As a second and independent ground, the election of directors in April, 1968 was of particular importance because Tenney's position as controlling shareholder of Omega was threatened by an action then pending in the Delaware Court of Chancery.[15] An agreement in settlement of this suit was signed on September 20, 1968 and thereafter approved by the Vice Chancellor. Pursuant to the settlement agreement, Tenney exchanged his Class B shares for Class A shares, and thereby gave up "absolute voting control" for a "strong minority position." The election of directors at the April, 1968 annual meeting, therefore, allowed Tenney to cement his controlling position on the Board of Directors before any diminution of his Class B ownership occurred, and before the commencement of the acquisition program financed in part by the sale and issuance of the letter stock of Omega. For these additional and independent reasons, the election of directors in April, 1968 may be viewed "an integral part of" the commission of the wrongs complained of in the present action.

The defendants are not persuasive in attempting to negate the significance of the April election of directors in view of the September settlement requiring Tenney to give up his Class B shares. The moving defendants first point out that in April 1968 Tenney and other directors "were only elected to one year terms as directors" and second, that at the present time, more than eighteen months after the outside shareholders allegedly

obtained "majority voting power," Tenney and his associates continue to control Omega. The first ground advanced here by the defendants seems irrelevant as a matter of law and fact. 8 Del.C. § 211(b) clearly envisages the annual election of directors. Directors serving for a period of longer than thirteen months would at least be subject to an election after the summary order of an annual meeting by the Court of Chancery, pursuant to 8 Del.C. § 211(c).

██ The Court concludes that the holding of a stockholders' meeting for the election of directors on April 29, 1968 in Delaware, arranged by mail, was of material importance to the execution and consummation of the alleged wrongdoing and was adequate under the circumstances of this case to sustain venue under section 27 of the '34 Act. Accordingly, defendants' motion to dismiss the complaint for improper venue will be denied.[16]

*Motions To Quash Order Of Sequestration.*

The plaintiff in this action did not serve the non-resident defendants by use of the extraterritorial process provided in section 27 of the '34 Act.[17] Rather the plaintiff obtained an order of sequestration, on December 16, 1969, pursuant to Rule 4(e), F.R.Civ.P. and 10 Del.C. § 366, which empowered the sequestrator to seize all shares of Class A stock of Omega standing in the names of the non-resident defendants as legal or beneficial owners.

The same defendants, who moved to dismiss for improper venue,[18] have also moved to quash the order of sequestration.

First, the moving defendants, citing United Industrial Corp. v. Nuclear Corp. of America, 237 F.Supp. 971 (D.Del.

---

15. Steigman v. Beery et al., C.A.No.1717.

16. In view of the Court's finding that venue is proper under section 27 of the '34 Act, it is unnecessary to consider plaintiff's alternative basis for sustaining venue on the novel theory of "pendent venue."

17. Section 27 of the '34 Act, 15 U.S.C. § 78aa, in part provides: " * * * process in such cases may be served in any other district of which defendant is an inhabitant or wherever the defendant may be found."

18. See footnotes 9, 10 and 11, *supra.*

1964), argue that since venue does not lie in this Court under section 27, sequestration cannot be used to obtain extraterritorial service upon the non-resident defendants. This argument, however, is without merit since the Court has already found venue to be proper under section 27.

Second, the moving defendants contend that sequestration is inapplicable with regard to a non-resident defendant who is subject to *in personam* service of process within or without the State of Delaware. The defendants again rely upon United Industrial Corp. v. Nuclear Corp. of America, *supra*, which held invalid the attachment of property pursuant to 10 Del.C. § 3506, of a non-resident defendant who was amenable to personal service outside of Delaware under section 27 of the '34 Act. After considering the policy of "foreign attachment" under 10 Del.C. § 3506,[19] Judge Steel in *United Industrial Corp.* concluded that the "same policy which precludes the use of foreign attachment against a non-resident individual who can be served with summons within the state, likewise requires that he be protected against the attachment of his property if he is subject to *in personam* service outside of the state." 237 F.Supp. at 983. The defendants urge the same "policy" recognized in *United Industrial Corp.* precludes resort to sequestration of stock of a non-resident who is nonetheless subject to *in personam* service outside of Delaware by the "long-arm" provisions of section 27.

Sequestration under 10 Del.C. § 366 has been recognized as foreign attachment in equity. There is, however, an important difference between the foreign attachment and sequestration statutes. 10 Del.C. § 366,[20] requires only a showing that the defendant "is a non-resident of the State of Delaware" in order to obtain an order of sequestration. Delaware Chancery Rule 4(db) is to the same effect, requiring only a showing that the "defendant or any one or more of the defendants is a non-resident." In contrast, 10 Del.C. § 3506, as amended in 1960, requires a showing both that the defendant is "not an inhabitant" of the State *and* also that the defendant "cannot be found." *United Industrial Corp.* construed the latter phrase to mean "cannot be found" either within or without the State of Delaware, 237 F.Supp. at 983. It should be noted, however, that Judge Steel recognized that from 1823 until 1960 a writ of foreign attachment could be procured simply by averring the non-residence of an individual defendant and the amenability of a non-resident individual defendant to *in personam* service in Delaware did not prevent the seizure of his property under a writ of foreign attachment. This was no longer true after the 1960 amendment when the language of the statute was changed to require the defendant not only to be a non-resident but also not be amenable to personal service. No similar language change was made in the sequestration statute. A showing of non-residence of a defendant is all that is or has been required to obtain a seizure order under 10 Del.C. § 366.

Further, a plaintiff in the Delaware Court of Chancery may use § 366 to seize a non-resident's property not only to

---

19. 10 Del.C. § 3506 provides as follows:
 "A writ of foreign attachment may issue against any individual not an inhabitant of this State on any cause of action after proof satisfactory to the Court that the defendant cannot be found, that the defendant resides out of the State, and that plaintiff has a good cause of action against the defendant in a sum exceeding $50."

20. 10 Del.C. § 366 reads, in part:
 "If it appears in any complaint filed in the Court of Chancery that the defendants or any one or more of the defendants is a non-resident of the State of Delaware, the Court may make an order directing such nonresident defendant or defendants to appear by a day certain to be designated. * * * The Court may compel the appearance of the defendant by the seizure of all or any part of his property, which property may be sold under the order of the Court to pay the demand of the plaintiff, if the defendant does not appear, or otherwise defaults."

force his appearance, but in case he fails to appear, to sell his property to satisfy the plaintiff's claim to the extent of the sequestered property. This Court perceives no valid policy reason why § 366 should not be construed in conjunction with Rule 4(e), F.R.Civ.P., to permit the sequestration of a non-resident defendant's property even though he may be amenable to personal service outside the State under the "long-arm" service provisions of section 27 of the '34 Act. Litigants in this Court should be treated the same as litigants in the State Court when State provisions for service are used in this Court. Accordingly, defendants' motion to quash the sequestration order of December 16, 1969 on the above grounds will be denied.

Defendant, Meyerson & Co., Inc., also moves to quash the sequestration order because it has no interest in the stock seized which was standing in its name on Omega's books. The return of the sequestrator on January 30, 1970 indicates that on December 22, 1969,[21] a total of 16,195 Class A shares of Omega were registered in the name of Meyerson & Co., Inc. The return also listed the certificate numbers representing that number of shares. An affidavit of Harold Bauman, Secretary of Meyerson & Co., Inc., filed on May 7, 1970, indicates that on April 20, 1970 (four months after the seizure) Meyerson had knowledge of only 6,900 of these shares,[22] which Meyerson held in its street name for certain enumerated individuals. The affidavit further states that "Meyerson did not have any beneficial interest in any of the securities of Omega outstanding on December 22, 1969, has not acquired any such beneficial interest subsequent to that date, and does not now have any beneficial interest in any of the securities of Omega."

■■ The plaintiff implicitly recognizes that when property not owned by a defendant has been seized by order of the Court entered pursuant to § 366, the order should be quashed and the property released from sequestration. Nickson v. Filtrol Corporation, 265 A.2d 425 (Del.Ch.1970). The plaintiff, however, finds the Bauman affidavit insufficient to explain the discrepancy between the 16,195 shares of Omega held of record by Meyerson on the date of seizure and the 6,900 shares which Meyerson has specifically accounted for as owned by listed individuals as of April 20, 1970, and therefore seeks discovery regarding this discrepancy. Although the Bauman affidavit recites that Meyerson had and has no beneficial interest in the Omega shares standing in its name, the plaintiff should be afforded an opportunity by way of discovery to confirm or disaffirm the statements contained in the Bauman affidavit with respect to the 9,295 shares not specifically accounted for. Steinberg v. Shields, 38 Del.Ch. 423, 153 A.2d 599 (1959). However, since the plaintiff does not challenge the Bauman affidavit concerning the actual ownership by the listed individuals of the 6,900 shares specifically accounted for, the order of sequestration with respect to these shares will be quashed and the shares released from seizure.

*Motions To Dismiss For Failure To State A Cause Of Action.*

Three of the mutual fund defendants [23] have moved for dismissal of the com-

21. The date on which the sequestrator gave notice to Omega of the seizure of the non-resident defendants' stock.

22. The Bauman affidavit claims to account for an aggregate of 8,195 shares owned beneficially by others but the number of shares individually accounted for total only 6,900 shares.

23. Mates Investment Fund, Inc., Ocean Technology Fund, Inc. and Pennsylvania Mutual Fund, Inc.

plaint against them for failure to state a claim upon which relief can be granted, contending that the naked assertions that they entered into a conspiracy with the officer-director defendants are insufficient as a matter of law. The allegations concerning the conspiratorial involvement of the mutual fund defendants in the wrongful acts complaint of are set forth in four paragraphs of the complaint.

In paragraph 8, it is alleged that the wrongs complained of "were effected pursuant to a scheme and conspiracy between * * * officers and directors of Omega and certain brokers and dealers in securities * * * and [certain] open-end investment companies * * * ", including among the latter group defendants Mates, Ocean Technology, and Pennsylvania.

In paragraph 11, it is alleged that "[a]t or about April 8, 1969, the officers-directors-defendants, the mutual fund defendants and the broker-dealer defendants entered into a conspiracy to buy and sell Class A shares of Omega which were not to be registered with the Securities and Exchange Commission under the Securities Act of 1933."

It is alleged that defendant Mates purchased 300,000 shares of such letter stock at a price of $3.25 per share, or a total cash consideration of $975,000, that defendant Ocean Technology purchased 6,500 shares at $5.50 per share, or a total cash consideration of $35,750, and that defendant Pennsylvania purchased 100,000 shares at $3.25 per share for a total cost of $325,000 (Par. 13).

The complaint further alleges that the above-described purchases of letter stock by the mutual fund defendants were pursuant to the alleged conspiracy and were in violation of Rule 10(b)–5 adopted pursuant to § 10(b) of the '34 Act (Par. 16). The specific relief sought against defendants Mates, Ocean Technology and Pennsylvania on behalf of Omega is "damages based on the inadequate prices which they paid for the Class A shares of Omega" (Prayer C.) and "[a]gainst all defendants jointly and severally for all damages inflicted on Omega, pursuant to the scheme and conspiracy herein complained of." (Prayer I.)

The plaintiff concedes that the mutual fund defendants were not fiduciaries of Omega and that they were entitled to drive as hard a bargain as possible in the purchase of the letter stock from Omega. Thus, the parties agree that the only issue here is whether the complaint sufficiently alleges the existence of a conspiracy so as to fix co-responsibility upon the mutual fund defendants for the alleged dereliction of Omega's actual fiduciaries, its officers and directors.

In regard to the necessary specificity in alleging a civil conspiracy, the Court of Appeals for this Circuit in Black & Yates v. Mahogany Association, 129 F.2d 227, 231–232 (C.A.3, 1942), cert. den. 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942) has stated:

"A general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action. Although detail is unnecessary, the plaintiffs must plead the facts constituting the conspiracy, its object and accomplishment. The plaintiffs have pleaded none of these facts. Neither the date of the alleged conspiracy nor its attendant circumstances are set forth. Nor is it averred who make the statements, where, when, or to whom."

The plaintiff, however, argues that Rule 8(a) (2), F.R.Civ.P., only requires a pleading to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" and that the allegations are adequate to meet this test. Yet, both the plaintiff and the mutual fund defendants approve the general statement of law that "the facts and circumstances which constitute the conspir-

acy, or *from which it may be inferred*, should be set out clearly, concisely and with sufficient particularity. * * * " (citing 15A C.J.S. Conspiracy § 25). The parties, however, are in sharp dispute concerning the application of these general standards to this case.

In evaluating the sufficiency of allegations of conspiracy, the generalities of the cases and treatises cannot be expected to define precisely the dividing line between a sufficient and insufficient complaint. Such generalities cannot replace a careful evaluation of the specific factual allegations and of the logical inference of conspiratorial motivation and participation which may be drawn from the facts alleged. While recognizing that the plaintiff need not allege in detail the manner of the formation or execution of the conspiracy, yet the Court must determine whether the facts alleged provide a sufficient basis for a logical and reasonable inference of conspiratorial design shared by the mutual fund defendants and the other alleged conspirators.

The plaintiff insists that the facts alleged permit an *inference* of conspiratorial involvement of the mutual fund defendants. The plaintiff points out that the cash needed for Omega's expansion program—about twelve million dollars— was raised by the sale of Omega's unregistered letter stock. Part of this stock as indicated was sold to the three moving mutual fund defendants. Due to the rapid increase of the market prices of Omega's registered stock (allegedly manipulated by the broker-dealer defendants), the mutual fund defendants were able to mark up the letter stock, in their own portfolios, so that by December, 1968 they carried at more than $10,000,-000, stock for which they had paid only $1,705,500. Hence, plaintiff argues that "this mark-up enabled them to sell their own stock at increased prices and thus shows a sufficient motive for their participation in the fraud on the public."

Were the Court to agree that this motive was a plausible basis for the par-

ticipation by the mutual fund defendants in a conspiracy with the officer-director defendants, then the participation in the conspiracy could be inferred from the pleaded facts and would be sufficient to avoid a motion to dismiss. However, the Court is unable to agree that this inference of motive is reasonable.

The mark-up in value of the Omega shares on the mutual fund books at the time when the market price of Omega's shares was high provided no benefit to the Mutual Funds *qua* mutual funds. Such a mark-up is required of the mutual fund defendants as registered investment companies. Under Regulation § 270.22 C–1 of the Securities and Exchange Commission (3 Fed.Securities Law Reporter, ¶ 48,762), the mutual fund defendants are required to fix each day a current net asset value of their portfolios. This net asset value is not merely the price at which new shares are sold, it is also the price at which outstanding shares must be redeemed upon demand. The mutual fund defendants are simply conduits for the interest of their shareholders, whose secondary benefit or loss from the rise or fall in the market price of Omega shares parallels precisely the benefit or loss incurred by a direct Omega shareholder, such as plaintiff. Under plaintiff's reasoning, it could be *inferred* that, since plaintiff's net worth increased with the rise in the market price of Omega's shares, he was also a part of an alleged conspiracy. It is unreasonable to infer from the pleaded facts that the mutual fund defendants had any logical reason to perceive a benefit in participating in a conspiracy to manipulate the share price of Omega in order to increase the mark-up of Omega's shares on the mutual fund defendants' books.

■ Thus, the complaint is left with only the bald legal conclusion that the mutual fund defendants engaged in a conspiracy without pleading, as required, facts and circumstances which constitute the conspiracy or from which it may be inferred that the mutual fund defendants

participated. Under such circumstances, the allegations of the complaint are insufficient to state a claim upon which relief may be granted against the mutual fund defendants. Accordingly, the motions of Mates, Ocean Technology and Pennsylvania to dismiss the complaint as to them will be granted with leave to the plaintiff to amend the complaint within twenty days to plead additional facts and circumstances of the mutual fund defendants' participation and involvement in the alleged conspiracy.

█ Arthur Jarwood, who is joined in this action both as an officer-director defendant and as a vendor defendant, has also moved to dismiss the complaint as to him for failure to sufficiently plead his involvement and participation in the alleged conspiracy. A mere recital of the allegations of the complaint as to the involvement of all the officer-director defendants in the alleged wrongdoing is more than sufficient to show his participation in the alleged wrongdoing. Jarwood's motion to dismiss the complaint as to him, therefore, will be denied.

*Plaintiff's Motion For The Entry Of Defaults.*

Plaintiff has moved pursuant to Rule 55(b), F.R.Civ.P., for default judgments against a number of defendants [24] who have failed to appear. However, since the entry of judgment should ordinarily await trial, the Court will consider plaintiff's motion as one for the entry of a default under Rule 55(a), F.R.Civ.P. This in any event is more consistent with the Delaware Chancery practice where a defendant fails to appear in response to service of the type attempted in this case under Rule 4(e), F.R.Civ.P., and 10 Del. C. §§ 365 and 366.

Whether a default should be entered against any of these defendants depends upon whether proper service has been perfected against them.

First, the plaintiff obtained an order of sequestration, under 10 Del.C. § 366, against the defaulting defendants on December 16, 1969. While plaintiff may have contemplated that the sequestrator would seize any indebtedness owed by Omega to the named defendants, the order prepared and submitted to the Court only *empowered* the sequestrator to seize Class A Omega shares of the defendants in which they had a legal or beneficial interest. The sequestrator was not given the *power* to seize any indebtedness. Moreover, a description of the indebtedness contemplated for seizure was neither specifically set forth in the order nor was it otherwise described in the sequestrator's notice given to Omega when the seizure order was served. As a consequence, according to the sequestrator's return on January 30, 1970, only Class A shares of stock standing in the names of certain defendants were seized. Thus, no property located in Delaware belonging to the defendants against whom a default is sought was seized other than 6,500 Class A shares of Omega held by Golden Gate Fund, Inc., 100 shares held by John B. Licota & Co., 100,000 shares held by Robert Mellin, and 400 shares held by Daniel Kursman.

█ Under these circumstances no effective service by sequestration of property has been made under Rule 4(e) and 10 Del.C. § 366 upon the defendants Harry W. Bank, Robert Mellin, Inc., Leon Breslow, Carol Breslow, Alfred Segal, Lila Segal, Thomas Garrett, Edward Silvers, Arnold Handzel and Jack Miller. Plaintiff's motion for a default against these defendants based upon service under 10 Del.C. § 366 will be denied. However, since Class A shares of Omega stock belonging to the defendants Golden Gate Fund, Inc., John B. Licota & Co.,

24. Defaults are sought against defendants, Harry W. Bank, Golden Gate Fund, Inc., John B. Licota & Co., Robert Mellin, Robert Mellin, Inc., Daniel Kursman, Leon Breslow, Carol Breslow, Alfred Segal, Lila Segal, Thomas Garrett, Edward Silvers, Arnold Handzel and Jack Miller.

Robert Mellin and Daniel Kursman, which have their situs in Delaware,[25] were properly seized under 10 Del.C. § 366, and these defendants having failed to appear, plaintiff's motion for default against them will be granted. It must be noted, however, that any money judgment which may be eventually entered against these defaulting defendants can only be satisfied to the extent of the proceeds realized from the sale of seized shares. Wightman v. San Francisco Bay Toll-Bridge Co., 16 Del.Ch. 200, 142 A. 783 (1928); Cantor v. Saks, 18 Del.Ch. 359, 162 A. 73 (1932).

 Second, the plaintiff obtained an order for substituted service of process pursuant to 10 Del.C. § 365 against the defaulting defendants on February 20, 1970. Section 365 is a method for bringing non-residents before the Court "by constructive service unattended by seizure, if the suit is one wherein the relief sought relates to the status, title or ownership of property located within its jurisdiction." Perrine v. Pennroad Corp., 19 Del.Ch. 368, 168 A. 196, 201 (1933); Krizanek v. Smith, 32 Del.Ch. 513, 87 A.2d 871 (1952). Thus, § 365 gives the court *in rem* jurisdiction over a *res* located in Delaware. The situs of shares of Omega, a Delaware corporation, is Delaware, 8 Del.C. § 169, and the indebtedness owed by a Delaware corporation also has its situs in Delaware. Weinress v. Bland, 31 Del.Ch. 269, 71 A.2d 59 (1950); Landau v. Best, 41 Del.Ch. 1, 187 A.2d 75 (1962), appeal dismissed 375 U.S. 801, 84 S.Ct. 25, 11 L.Ed.2d 37. Thus, it is clear that the indebtedness, claimed to be invalid and owed by Omega to these defendants, and all shares of Omega stock, claimed to be invalidly issued or invalidly authorized for issue to the defendants, affords a sufficient *in rem* jurisdiction of this Court over the indebtedness and shares. However, a money judgment cannot be awarded in a suit in which *in rem* jurisdiction is obtained by substituted service of process; only the *res* before the Court can be affected by rescission, cancellation or like relief. Bouree v. Trust Francais des Actions de la Franco-Wyoming Oil Co., 14 Del.Ch. 332, 127 A. 56 (1924); Skinner v. Educational Pictures Securities Corp., 14 Del.Ch. 417, 129 A. 857 (1925); Hodson v. Hodson Corp., 32 Del.Ch. 76, 80 A.2d 180 (1951).

Since the prayers of the complaint seek to cancel any of Omega's indebtedness to defendant Harry W. Bank and to subordinate any of Bank's rights to the issuance of any Omega shares to him to the rights of public stockholders, the Court concludes there is *in rem* jurisdiction over a *res* located in Delaware and a default will be entered against defendant Bank for non-appearance pursuant to 10 Del.C. § 365.

Moreover, since the complaint seeks to rescind and cancel all indebtedness owed by Omega and all Omega shares issued to the vendor defendants, viz. Robert Mellin, Robert Mellin, Inc., Daniel Kursman, Leon Breslow, Carol Breslow, Alfred Segal, Lila Segal, Thomas Garrett, Edward Silvers, Arnold Handzel and Jack Miller, the Court concludes that *in rem* jurisdiction exists over this property belonging to these latter named defendants which could be validly cancelled. Accordingly, a default will be entered against defendants, Robert Mellin, Robert Mellin, Inc., Daniel Kursman, Leon Breslow, Carol Breslow, Alfred Segal, Lila Segal, Thomas Garrett, Edward Silvers, Arnold Handzel and Jack Miller for failure to appear pursuant to the order for substituted service made pursuant to 10 Del.C. § 365.

25. Shares of stock in a Delaware corporation, such as Omega, have their situs in Delaware, 8 Del.C. § 169, and may be seized under 10 Del.C. § 366 to force an appearance and in case of non-appearance be sold later to satisfy any judgment entered. Cantor v. Saks, 18 Del.Ch. 359, 162 A. 73 (1932); Breech v. Hughes Tool Co., 41 Del.Ch. 128, 189 A.2d 428 (1963).

*Motions For Transfer Stay.*

The present suit is one of ten [26] separate federal actions commenced in three different districts based upon substantially the same transactions and occurrences: seven were commenced in the Southern District of New York; one, in the Northern District of California; and two, including this case, in the District of Delaware. All such actions, except two, were based on a complaint filed by the Commission against Omega and nine of its former employees on April 19, 1969 in the United States District Court, Central District of California entitled Securities and Exchange Commission v. Omega Equities Corporation et al. (Civil Action No. 69–689). The other two actions, while preceding the Commission's complaint, are based on substantially the same transactions and occurrences as underly the Commission's complaint and have already been consolidated into the *Rosenblatt* action in the Southern District of New York.

On May 23, 1969 defendants including Omega, Hull and Tenney moved to consolidate the seven actions pending in the Southern District of New York on the ground that the transactions and occurrences set forth in the seven complaints were substantially the same as those described in the Commission's complaint and that, therefore, permitting these multiple actions to go forward separately would impose serious and unnecessary burdens on both the defendants and the Court. Specifically the defendants' motion sought an order directing, *inter alia* (a) the consolidation of the seven actions for all purposes; (b) the designation and appointment of a coordinating general counsel to conduct the consolidated action on behalf of all plaintiffs and any intervenors; (c) the filing of a consolidated amended complaint setting forth all of the claims alleged in the various complaints; and (d) a stay prohibiting other shareholders from commencing or prosecuting actions seeking the relief sought herein based upon the transactions alleged in the seven actions.

On June 18, 1969, the Court found that all seven actions "involve[d] common questions of law and fact" and accordingly granted defendants' motion, directed

26. The following are the names of the actions and the dates on which they were commenced:

| Action | Date | District |
|---|---|---|
| Rosenblatt v. Emory et al. (69 Civ. 90) | Jan. 9, 1969 | S.D.N.Y. |
| Hirtenstein v. Emory et al. (69 Civ. 181) | Jan. 16, 1969 | S.D.N.Y. |
| Ross v. Hull et al. (69 Civ. 1711) | April 23, 1969 | S.D.N.Y. |
| Tropper v. Hull et al. (69 Civ. 1782) | April 28, 1969 | S.D.N.Y. |
| Gindin v. Bank et al. (69 Civ. 1783) | April 28, 1969 | S.D.N.Y. |
| Lerman v. Omega Equities Corp. et al. (69 Civ. 1785) | April 29, 1969 | S.D.N.Y. |
| Darwish v. Hull et al. (69 Civ. 2032) | May 12, 1969 | S.D.N.Y. |
| Tropper v. Hull et al. (Civil Action No. 3705) | May 23, 1969 | D.Del. |
| Tetrud v. Omega Equities Corp. (Civil Action No. 51479) | June 6, 1969 | N.D.Cal. |
| Jacobs v. Omega Equities Corp. (Civil Action No. 3795) | October 28, 1969 | D.Del. |

that a consolidated amended complaint be served on behalf of the six consenting plaintiffs, and appointed lead counsel for the consolidated action.[27] The Court declined, however, to enter an order staying all other stockholders from beginning further actions.

On August 15, 1969 lead counsel for plaintiffs in the consolidated action effected timely service of the consolidated amended complaint and on September 3, 1969 timely service of the answer on behalf of the defendants was also made. On October 31, 1969, Omega and certain individual defendants moved to stay the action pending against Omega in the Northern District of California entitled Tetrud v. Omega Equities Corporation (Civil Action No. 51479) until final determination of the consolidated *Rosenblatt* action in the Southern District of New York or, in the alternative, for an order pursuant to 28 U.S.C. § 1404(a), transferring the action to the Southern District of New York. That motion was made on the same grounds as the defendants' present motion. In the *Tetrud* case, plaintiff had previously moved for an order determining that his action be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure. On December 3, 1969 a stipulation was entered into providing for a stay of the *Tetrud* action on condition that the New York Federal Court permit the *Rosenblatt* action to be maintained as a class action with a class including Tetrud's claim.

Certain of the defendants[28] have moved for an order staying the present case until final determination of the consolidated *Rosenblatt* action pending in the Southern District of New York or, in the alternative, for an order trans-

ferring this action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).

For the reasons hereinafter stated, the Court concludes that this action should not be stayed but should be transferred to the United States District Court for the Southern District of New York.

28 U.S.C. § 1404(a) provides that a civil action might be transferred to another district court "where it might have been brought" if it appears to be "for the convenience of the parties and witnesses, in the interest of justice."

There appears to be no serious question that the present action could have been brought in the Southern District of New York. As heretofore pointed out, plaintiff's action is based in part on the Securities Act of '34, which provides for nationwide service of process "wherever the defendant may be found" 15 U.S.C. § 78aa. Omega's principal place of business at the time of the violation alleged in the present complaint was New York City and negotiations with many of the parties referred to in the complaint took place in New York City. Also, according to the *Rosenblatt* complaint, several plaintiffs purchased stock there at inflated prices. Any of these contacts in New York would be sufficient to establish venue in the Southern District under section 27. With venue properly established in New York, process could be served nationwide upon the defendants.

As to the convenience of the parties and witnesses, a transfer from Wilmington to New York—a mere 116 miles away—would mean very little difference. The plaintiff is a resident of the District of Columbia;[29] none of the parties

---

**27.** Of the seven plaintiffs, only Gindin opposed the defendants' motion on the merits, and also objected to the appointment of lead counsel for the consolidated action.

**28.** The defendants who have moved for a stay or transfer are: Omega Equities Corporation, Phillip Kasenove, Nathan Shapiro, Theodore M. Lakos, Meyerson

& Co., Inc., Arthur Jarwood, Erwin Bernstein, Leonard Cohen, and Kleiner-Bell & Co., Inc. None of the other defendants has opposed these motions.

**29.** In a shareholder's derivative suit, plaintiff's choice of forum is entitled to little weight. Koster v. (American) Lumbermen's Mutual Cas. Co., 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

or witnesses have residences or have their principal places of business in Delaware. In fact no substantial argument is made that New York is not as convenient for the parties and witnesses as Delaware. At least these factors are in equipoise. However, turning to the standard of "interest of justice," the balance heavily favors a transfer to the Southern District of New York.

■ The seven cases now pending in New York are based essentially on the same underlying course of conduct by Omega and other defendants as alleged in the present suit. There is substantial identity in the questions of fact and law raised in all the cases. In such circumstances, these actions should be brought together in a single forum for disposition. The balance of convenience, and particularly, the interests of the courts in the effective administration of justice, weigh heavily in favor of transfer. There is a strong policy favoring the litigation of substantially similar claims in the same tribunal in order that (1) pretrial discovery may be conducted more efficiently; (2) the witnesses can be saved time and money; (3) duplicitous litigation can be avoided, thereby eliminating incurring expense to the parties and the public and (4) inconsistent results can be avoided. Schneider v. Sears, 265 F.Supp. 257 (S.D.N.Y. 1967); Freiman v. Texas Gulf Sulphur Co., 38 F.R.D. 336 (N.D.Ill. 1965). As Judge Wyatt stated in Schlusselberg v. Werly, 274 F.Supp. 758, 764 (S.D.N.Y. 1967), a failure to transfer under the circumstances here faced would be "inexcusably poor judicial administration."

■ Plaintiff advances several reasons for his opposition to transfer. First, he contends that to the extent jurisdiction herein asserted is *in rem* to determine the claims of tangible or intangible property whose situs is in Delaware, the case cannot be transferred to another district court. Undoubtedly, this is the rule with respect to a purely *in rem* action because it has generally been held that power is lacking under § 1404(a) to transfer such a case to a forum which has no jurisdiction over the *res* and thus is not one which "might have been brought" in the transferee district. Clinton Foods v. United States, 188 F.2d 289 (C.A. 4, 1951) cert. den. 342 U.S. 825, 72 S.Ct. 45, 96 L.Ed. 624 (1951); Hughes v. S. S. Santa Irene, 209 F.Supp. 440 (S.D.N.Y.1962). But the rule is entirely different when *in rem* claims are joined with *in personam* claims. In such cases, the entire action may be transferred under § 1404(a) to a transferee district where the action "might have been brought" based on the *in personam* claims alone. Continental Grain Co. v. Federal Barge FBL–585, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed. 2d 1540 (1960); Ladson v. Kibble, 307 F.Supp. 11 (S.D.N.Y.1969). As already pointed out, the plaintiff could have brought this action in the Southern District of New York to vindicate rights protected by the Federal Securities laws since proper venue would have existed under section 27 of the '34 Act. The plaintiff could also have obtained personal service upon all the defendants by the "long-arm" provisions of section 27. The same is true with respect to the instant case. However, the plaintiff here instead of obtaining personal service upon defendants resorted to Rule 4(e), F.R.Civ.P. and 10 Del.C. §§ 365 and 366 to obtain an order of sequestration and an order for substituted service. The *in rem* nature of the jurisdiction thus obtained is more limited in scope than he would otherwise be entitled to under section 27 of the '34 Act.

In Van Dusen v. Barrack, 376 U.S. 612, 624, 84 S.Ct. 805, 813, 11 L.Ed.2d 945 (1964), the Supreme Court stated that § 1404(a) "should be construed to prevent parties who are opposed to a change of venue from defeating a transfer which, but for their own deliberate acts or omissions, would be proper, convenient and just."

■ The Court therefore concludes that despite the limited *in rem* nature of the jurisdiction actually obtained in Delaware, transfer to the Southern District

of New York is proper since venue exists there and personal jurisdiction over the defendants is available there. The action is one which "might have been brought" in New York and is thus transferable under the standards set forth in Hoffman v. Blaski, 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960); Continental Grain Co. v. Barge FBL–585, *supra;* Van Dusen v. Barrack, *supra.* A party should not be allowed to prevent the transfer of a case otherwise transferable, to another federal court by deliberately resorting to the use of state enacted *in rem* procedures to acquire jurisdiction, particularly when the vindication of federally protected rights is sought.

▆ The plaintiff next argues that the present complaint seeks the appointment of a receiver for Omega, and in the alternative, an injunction against "all transactions outside the ordinary course of business, including the issuance of further securities and the purchase and sale of assets," and that such relief, requiring the regulation of the "internal affairs" of a corporation can be granted only at the corporate domicile. This contention is without merit. A federal court has the power to inquire into the internal affairs of a foreign corporation and the power to appoint a receiver of a foreign corporation—even when the assets of the corporation lie outside the district of the appointing court. In Burnrite Coal Briquette Co. v. Riggs, 274 U.S. 208, 47 S.Ct. 578, 71 L.Ed. 1002 (1927), the Supreme Court held that a New Jersey federal court had the power to appoint a receiver for a Delaware corporation to preserve its assets from alleged gross mismanagement. Rogers v. Guaranty Trust Co., 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1933), relied upon by plaintiff, did not hold that a federal court lacks the power to appoint a receiver of the assets of foreign corporations, but only that it may

decline to exercise such power as a matter of comity.[30]

▆ The plaintiff further contends that the relief requested to subordinate Omega's stock held by management to that publicly held can be granted only at the corporate domicile, apart from jurisdiction founded on bankruptcy. This contention is clearly erroneous. This case is based in part on the violation of the Securities Act of '34. The Supreme Court held in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) that federal courts were empowered to provide the remedies required to carry out the congressional purpose of protecting federal rights, citing the language in Deckert v. Independence Shares Corp., 311 U.S. 282, 288, 61 S.Ct. 229, 233, 85 L.Ed. 189 (1940):

"The power *to enforce* implies the power to make effective the right of recovery afforded by the Act. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case."

▆ In addition to the inability of the New York Court to grant certain requested relief, the plaintiff contends that a transfer to New York would prejudice and restrict the ability of the plaintiff to prosecute the action. First, plaintiff urges that transfer and likely subsequent consolidation will "force" plaintiff "against his will * * * [into] a conflicting position"—citing Atkinson v. Roth, 297 F.2d 570 (C.A. 3, 1961). The alleged "conflict" is that the plaintiffs in the *Rosenblatt* complaint alleged that they purchased the stock at artificially inflated prices whereas the present complaint alleges that the mutual fund defendants purchased their shares at prices substantially below the fair value of the shares. The conflict is a figment of the imagination. It is not

---

30. There should be no doubt at present as to a federal court's power to appoint a receiver in view of 28 U.S.C. § 754. 7 Moore, Fed.Pract. § 66.08 [1].

conflicting or inconsistent to allege that favored defendants received unfair bargain prices while the public paid artificially inflated prices. The *Commission* and the *Rosenblatt* complaints (pars. 35 (b) and 17) make both of these allegations.

■ The plaintiff next contends that, under the order of the New York Court consolidating pretrial discovery and appointing lead counsel, he will be subject to counsel "who are primarily interested in the representative suits against Omega rather than in the derivative action on behalf of Omega." The consolidation of the seven related actions filed in New York by Judge McLean undoubtedly was effected to prevent waste and duplication of effort which would otherwise inevitably result. This Court does not perceive that the appointment of lead counsel in New York for certain purposes, including pretrial discovery, will prejudice the development of any derivative cause asserted by plaintiff on behalf of Omega even if this action should be consolidated after transfer.³¹

■ Finally, plaintiff argues that the *Rosenblatt* complaint "does not include the common law and equitable causes of action" included herein. This contention is erroneous. The *Rosenblatt* complaint does contain a common law cause of action for "wrongful waste and spoilation of Omega's assets," although there is no specific relief requested in *Rosenblatt* for equitable relief subordinating the Omega stock of defendants to publicly held stock or for an injunction. Such relief could be granted by the New York Court pursuant to the general request in *Rosenblatt* for "such other and further and different relief as may be just."

After considering the various factors relevant to the motion for stay or transfer, this Court concludes that in order to avoid serious and unnecessary burdens on the individual and corporate defend-

ants, and to serve the interest of efficient judicial administration, the present action should be transferred to the Southern District of New York.

An order will be entered in accordance with this opinion.

31. In any event, it is purely speculative at this point to anticipate the type and extent of consolidation which the New York Court might possibly order for this case.