AMERICAN AIRLINES, INC., Plaintiff,

v.

TRANSPORT WORKERS UNION OF
AMERICA, INTERNATIONAL,
AFL-CIO, et al., Defendants.

United States District Court
S. D. New York.

Feb. 7, 1962.

Arthur M. Wisehart, New York City,
for plaintiff.

John F. O'Donnell, New York City, for
defendants.

BONSAL, District Judge.

THE COURT:

The plaintiff, American Airlines, has
moved for a preliminary injunction
against the Transport Workers Union of
America, International AFL-CIO, Mich-
ael Quill, Matthew Guinan and James F.
Horst, individually and in their repre-
sentative capacities, as stated in the cap-
tion of this case.

A hearing has been held today, and
testimony has been taken.

The preliminary injunction
would be effective during the pendency
of the action and would restrain and en-
join the defendants and each of them,
and all the plaintiff's employees repre-
sented by or affiliated with the defendant
TWU and all persons acting in concert or
participating with them from causing,
conducting or engaging in or attempting
to induce others to engage in the mailing,
publishing, displaying, circulating or dis-
tributing of any statement in which it is
threatened, stated, suggested or implied
that the operations of plaintiff will be
struck by the defendants, or containing
any false, misleading or defamatory
statement whatsoever, or any strike, par-
tial strike, work stoppage, sitdown, slow-
down or curtailment of work performed

for plaintiff, or in any concerted refusal to accept overtime assignments or to perform work assigned to them by plaintiff in the operation of its air transportation system, or any other act of economic coercion against plaintiff.

It would also enjoin the defendants from in any manner interfering with, by union discipline, penalty or otherwise, or inducing or attempting to induce any person to interfere with any employee of plaintiff or of its suppliers or independent contractors in his work for plaintiff, or in any manner interfering with or affecting the orderly continuance of plaintiff's business and plaintiff's operation of aircraft in its air transportation service, and from taking any action which would interfere with this Court's jurisdiction in the premises; and causing, conducting or engaging in or attempting to induce others to engage in any picketing of plaintiff's premises or before any of plaintiff's ticket offices or other places of business.

The preliminary injunction requested by the plaintiff would require the defendants and each of them to issue such notices and instructions and to take such other steps as shall be necessary or appropriate to carry into effect the intent of the previous paragraphs and to present to this Court and to plaintiff evidence of the action taken in compliance therewith.

As to the facts:

Plaintiff operates an airline which serves some 60 cities in the United States and serves Toronto, Canada, and Mexico City, Mexico. It has about 24,000 employees, of whom, according to the evidence taken today, approximately 11,100 appear to be members of the defendant's union.

The plaintiff transports 25,000 passengers a day. Its daily revenue from passengers, freight and mail runs to about $1,000,000. It is said to be the largest air freight carrier in the country. It certainly appears to play an important part in the airline industry, and there was testimony that some 25 per cent of the goods which it carries are essential to national defense.

In addition to serving passengers directly, of course, it operates as a connecting airline for passengers coming from other regions of the United States or from abroad.

On Tuesday, January 23, 1962, the boards of directors of the plaintiff, American Airlines, and of Eastern Air Lines entered into a merger agreement, which agreement has been filed with the Civil Aeronautics Board. This agreement provides that it shall not become effective until it has been approved by the stockholders and by the CAB. It seemed to be conceded at the hearing that it would take some eight months before the merger agreement could become effective.

On the same day, Tuesday, January 23, 1962, the plaintiff, American Airlines, issued a press release. It appeared from the evidence that prior to the issuance of this press release, Mr. Kayser, vice-president of American Airlines, telephoned Mr. Horst, the vice-president of the defendant TWU, and read to him the press release. It appears that Mr. Horst made no requests or observations in connection with the press release, other than he did mention that the term "merger" had an unpopular connotation in his union.

I should mention at this time that the second paragraph of Section 5 of the merger agreement between the plaintiff, American Airlines, and Eastern Air Lines, provides as follows:

"All the employees of the Constituent Corporations on the effective date of the merger will be become employees of the Combined Corporation. Thereafter, in case of a reduction in the number of employees, equal opportunity for employment in the available positions will be afforded to qualified employees of both of the Constituent Corporations, giving consideration to experience, length of service and ability, as determined by the Combined Corporation. The Combined Corporation will also accept reasonable labor protective pro-

visions of the character and extent previously prescribed by the Civil Aeronautics Board, which provide, among other things, for allowances for certain employees who, as the result of the merger, may be displaced or dismissed."

On January 24th, the day after the public announcement of the merger, Mr. Matthew Guinan, International secretary-treasurer, and James F. Horst, International vice president and director of the Air Transport Division of the defendant TWU sent a telegram, which was immediately released publicly, to Mr. C. R. Smith, president of American Airlines, and Malcolm A. MacIntyre, president of Eastern Air Lines, which telegram reads as follows:

"The Transport Workers Union of America, AFL-CIO, most vigorously protests the proposed $902,818,000 merger of American Airlines and Eastern Air Lines as an unjustifiable and unparalleled stock manipulation to create the world's greatest commercial aviation monopoly to the detriment of our national safety and security and the welfare of the 34,-000 employees and their families.

"We put you on notice now that the Transport Workers Union of America, AFL-CIO, will not tolerate any tampering with the job security of even one employee.

"We also warn you that we do not intend to abandon the welfare of our members to whatever disposition the Civil Aeronautics Board cares to make of them. This may be your callous position. It most definitely is not ours.

"As the union representing the majority of the employees we demand absolute guarantees from you on these matters by no later than February 1 and hereby notify you that unless such guarantees are made we shall be compelled to set a strike date to protect the employees on both these airlines."

On January 30, 1962, G. Marion Sadler, vice president and general manager of American Airlines, Inc., sent a telegram to Mr. James F. Horst, International vice president, Air Transport Division, Transport Workers Union of America, in the following terms:

"In reply to your telegram of January 24, you will find by referring to our application to the Civil Aeronautics Board that as part of the plan for building a stronger and more productive airline system, the combined corporation will accept labor protective provisions of the character and extent previously prescribed by the Civil Aeronautics Board in merger cases."

On February 2, 1962, Mr. Matthew Guinan, International secretary-treasurer, and James F. Horst, International vice president and director of the Air Transport Division, Transport Workers Union of America, addressed a telegram to C. R. Smith, president of American Airlines, as follows:

"Your reply to our demand for job security for our members in the proposed merger of American and Eastern Air Lines is totally unacceptable. It is a complete evasion of what we demanded from you absolute guarantees against layoffs for your 34,000 employees. Your answer to let the CAB chop up the work force is not only insensible arrogance. It is strike-provoking. We warned you 8 days ago that we will not permit your wheeling and dealing with the jobs of our members in your $902,818,000 stock manipulation.

"Since then while you conferred with your banking and insurance monopolists managing the merger we have met with our membership, your employees, throughout the American and Eastern Air Lines systems across the country.

"As representative of the majority of your employees, we now advise you that our members whom you

will soon realize are more important to your continued operations than finagling financiers have authorized their Presidents' Council to meet in New York on February 9th at 10 A.M. at the Piccadilly Hotel for the express purpose of setting a simultaneous strike date against your companies.

"Be assured that we will notify you of the effective date of the shutdown of your operations."

The evidence adduced at the hearing—and I think this evidence was conceded by the defendant—was that during the few days prior to the February 2nd telegram, Messrs. Guinan and Horst were on a trip around the United States, visiting Tulsa, Fort Worth, Los Angeles and San Francisco, and during the course of their trip they visited with members of the defendant union in connection with the proposed airlines merger, the purpose of the trip is apparent from a reading of the February 2nd telegram.

The evidence also indicates that considerable newspaper publicity attended the telegram of February 2nd, and that accounts with respect to it appeared in 90 different papers in 67 cities. There is also evidence that in the New York area this telegram was the subject of considerable publicity in the course of radio and television broadcasts.

A reading of these communications makes it appear that the defendant union is not seeking a conference or seeking changes in its contracts with the airlines. On the other hand, according to the testimony, the airline has been prepared to confer with the union at any time and has so advised the union.

There was also evidence to the effect that the airline has held conferences with other unions which are involved in its operations.

In other words, these communications and the publicity that attended them are in effect a widely publicized threat by the defendant to strike the plaintiff by reason of these merger proceedings. There is no showing that the plaintiff did

not have a perfect right to engage in these merger negotiations, and to enter into the merger agreement subject to the approval provided by law.

The defendant has asserted that many of its members will lose their jobs in the event the merger is consummated. There is no evidence to support this, and it is conceded that at the present time no one has lost his job by reason of the pending merger.

The plaintiff and defendant are parties to four different bargaining contracts. The first is a contract effective January 31, 1961, between American Airlines, Inc. and Transport Workers Union of America AFL-CIO, covering airline mechanic, plant maintenance, fleet service and ground service employees of American Airlines, Inc.

The second contract, between the same parties, covers stock clerk and lead stock clerk employees of American Airlines, Inc., and the evidence indicated that the members of the union covered by these two contracts numbered approximately 9,000.

The third contract is with the airline stewardesses in the service of American Airlines, as represented by the Air Line Stewards and Stewardesses Association, International, which, according to the hearing, has now become absorbed by or acquired by the defendant TWU. This contract covers approximately 1,500 members of the defendant union.

The fourth contract, dated September 6, 1958, covering some 600 employees is with the airline communication employees in the service of American Airlines, Inc., as represented by the Air Line Communication Employees Association, Unaffiliated. The indications in the hearing are that this agreement was also assumed by the defendant TWU.

The fourth agreement is now open and is being subject to negotiation under the Railway Labor Act.

The first three contracts are still closed but will come up for renegotiation in the next few weeks.

It appeared from the hearing that two of these contracts contained a no-strike clause, but with respect to all four a no-strike clause is unnecessary, as the same result is provided by operation of law.

A common provision appearing in all of these contracts deals with Seniority. Its usual form is as follows:

"Title seniority shall govern all employees hereunder in the case of promotion, demotion, transfer, retention in case of reduction in force, and re-employment after release due to reduction in force, provided that the employee's qualifications are sufficient for the conduct of the work in the classification to which he is to be assigned."

It is true that according to these messages that I have previously quoted, the meeting of the President's Council to be held on February 9th, is for the purpose of fixing a date for a strike. No strike has been called to date, but the threat has been made. There is nothing to indicate that the February 9th meeting is more than a pro forma operation, which could determine then, or later, to call a strike against American Airlines.

The facts and opinions adduced in the course of the hearing indicate that if such a strike is called, American Airlines would have to shut down, that its employees would be put out of work, that it would dislocate the transportation system of the United States, and indeed effect the transportation system between the United States and foreign countries. The strike threat which has been made has already adversely affected the business of American Airlines.

It would appear that such a strike would cause irreparable damage to American Airlines, and, indeed, it would cause very serious damage to the public who use it. It would be bound to have a substantial effect on the economy and on the national defense of the United States.

As to the law:

 It has been argued that the second paragraph of Section 5 of the mer-ger agreement violates the paragraph dealing with Seniority contained in the labor contract. The Court does not find that it does.

In the first place, the merger agreement will not become effective until it is approved by the stockholders and by the CAB. Should the merger become effective, as a matter of law the labor contracts, if they are still in effect, will be a binding obligation of the surviving corporation, and the union can resort to its rights under those contracts without reference to anything that might be said in the merger agreement.

I might add parenthetically that the evidence indicates that all of these labor contracts will probably be open for renegotiation before the merger becomes effective and that consequently any changes that might be made in the contracts would only be made after proper and due negotiation between the plaintiff and the defendant.

At first blush, the reading of these communications might indicate that the defendant was merely making a public threat to strike the plaintiff to stop the merger with Eastern Air Lines. That would seem to be a fairly obvious conclusion to be reached. However, much has been said by the defendant about seniority and job security, so that for the purposes of this opinion I am assuming that these factors are its principal concern, and such concern led to the defendant making these protests. It is therefore, a proper labor dispute.

 So construed as a labor dispute, both plaintiff and defendant are subject to the Railway Labor Act, and both are required to comply with its provisions. The labor contracts introduced in evidence here are, of course, subject to the Railway Labor Act. There is no evidence of any attempt on the part of the defendant to use the elaborate and long-tried machinery of the Railway Labor Act in connection with its labor dispute on the subjects of seniority and job security. The whole purpose of the Act is to prevent employers and unions alike from engaging in acts which may ad-

versely affect the national economy, without first having used the means provided by law for the adjustment of their disputes.

There is no showing here that if the pending merger will affect job security or seniority of the members of the defendant union, they cannot properly negotiate that matter through the machinery of the Railway Labor Act, 45 U.S.C.A. §§ 181–188, and indeed, the contracts themselves provide machinery for negotiating such a dispute through the various adjustment boards therein provided.

It is this strike threat by the defendant, without making any attempt to use the elaborate machinery provided for labor disputes, which constitutes the basis for a preliminary injunction here.

I might refer at this point to the case of Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Company, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed. 2d 622 (1957). It is true that the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., precludes the courts from issuing injunctions where the immediate rights of the union to collective bargaining are involved, but this is not the situation here. This is like the situation in the Brotherhood of Railroad Trainmen case, where injunction will lie for failure to use the machinery that has been provided.

In recent days this Court has issued an injunction against the defendant in connection with the strike threat involved in the proposed merger between the New York Central and the Pennsylvania Railroad, New York Central R. R. v. Transport Workers Union of America, AFL-CIO, 44 CCH Lab.Cas. ¶ 17,429 (S.D.N.Y. January 24, 1962), and a similar injunction was issued by the Eastern District of Pennsylvania in an action instituted by the Pennsylvania Railroad. Pennsylvania Railroad Co. v. Transport Workers Union of America, AFL-CIO, D.C., 202 F.Supp. 134, (E.D.Pa. January 30, 1962).

In the view of the Court, the facts and circumstances surrounding these two cases parallel very closely the facts here presented.

Therefore, the preliminary injunction will issue.

A preliminary injunction will issue, conditioned on the posting of a bond by the plaintiff in the amount of $5,000, and jurisdiction will be retained by the Court for the making of such further orders as may be necessary or appropriate.

Submit proposed injunction on notice.