**Frederick L. PRETTNER et al.,
Plaintiffs,**

v.

**James W. ASTON et al., Defendants.**

**Civ. A. No. 4142.**

United States District Court,
D. Delaware.

Feb. 28, 1972.

Bruce M. Stargatt, and Edward B. Maxwell, 2nd, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Herbert A. Levy, Washington, D. C., and Richard F. Watt, of Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for plaintiffs.

Edmund N. Carpenter, 2nd, of Richards, Layton & Finger, Wilmington, Del., Donald Keith Hall, of Darling, Hall, Rae & Gute, Los Angeles, Cal., and Joseph Barbash, of Debevoise, Plimpton, Lyons & Gates, New York City, for defendants American Airlines, Inc. and Western Air Lines, Inc.

Richard F. Corroon, of Potter, Anderson & Corroon, Wilmington, Del., for certain individual defendants.

## OPINION

STAPLETON, District Judge.

Plaintiffs Prettner and Weidemueller, shareholders of American Airlines, Inc., a Delaware corporation, ("American") and DePrey and Bailey, shareholders of Western Air Lines, Inc., a Delaware corporation, ("Western") brought this action against American, Western and the members of their respective boards of directors. The complaint alleges that proxy statements of American and Western issued in connection with a proposed merger of the two companies violated Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j, 78n and Rules 10b–5, 14a–3 and 14a–9 of the regulations promulgated under that Act.

Defendants have filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. Both sides have filed extensive affidavits in connection with that motion and the court, accordingly, will treat the motion as one for summary judgment pursuant to Rule 12(b). The individual defendants who comprise the board of directors of Western have also filed a motion to dismiss on the grounds of lack of jurisdiction over them, improper venue, insufficiency of process and insufficiency of service of process.

American is one of the nation's largest airlines. Western ranks tenth in size out of eleven United States trunk airlines. It serves fourteen of the western states, including Alaska and Hawaii. It also serves points in western Canada and the Republic of Mexico. American

and Western have entered into an Agreement of Merger, dated as of January 14, 1971, calling for the merger of Western into American. In February of 1971 the companies mailed proxy statements to their respective stockholders in connection with special meetings to be held on March 19, 1971 to vote upon the merger. At the American meeting, held in Wilmington, Delaware, the merger agreement was approved by a vote of 15,782,533 votes in favor to 226,733 votes against. The Western stockholders, convened in Los Angeles, approved the merger agreement by a vote of 3,915,220 votes in favor to 81,707 votes against.

The merger requires the approval of the Civil Aeronautics Board ("CAB") and the President of the United States. The merger agreement was filed with the CAB in January, 1971 and hearings thereon were completed in July of that year. American and Western are currently awaiting a decision of the CAB.

Plaintiffs Prettner and Weidemueller, in addition to being stockholders of American, are employees of Western and members of the Air Line Pilots Association, International ("ALPA"). ALPA is the exclusive collective bargaining representative of the pilots and stewardesses employed by Western. Plaintiffs DePrey and Bailey, in addition to being stockholders of Western, are employees of Western and members of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, ("Teamsters") and Teamster Local 2707. The Teamsters are the exclusive bargaining representative of the airline mechanics, utility/fleet service employees, and stock clerks employed by Western.

Plaintiffs here assert that the proxy statements, by reason of a material misstatement and numerous material omissions, were false and misleading. Defendants deny these allegations. In order to understand the positions of the parties it is necessary to review the facts giving rise to a dispute currently pending between the ALPA and the

Teamsters on the one hand and Western and American on the other.

## I.  THE BACKGROUND DISPUTE

Western employs approximately 1,332 airline mechanics, 439 utility/fleet service employees and 120 stock clerks. American employs approximately, 5,411 airline mechanics, 5,448 utility/fleet service employees and 670 stock clerks, all of whom are represented by the Transport Workers Union of America ("TWU"), which is the exclusive collective bargaining representative of these employees.   There are approximately 1,033 pilots and 1,122 stewards and stewardesses employed by Western and approximately 3,400 pilots and 4,700 stewards and stewardesses employed by American.   American's pilots are represented by the Allied Pilots Association ("APA") and its stewards and stewardesses are represented by the Air Line Stewards and Stewardesses Association, Local 550, TWU, each of which is the exclusive collective bargaining representative of these respective groups of employees.   Thus, the above-described employee groups of each carrier are represented by different unions and their employment is governed by different collective bargaining agreements.

Western's collective bargaining agreements with the Teamsters and the ALPA contain provisions which those unions claim make the agreements binding upon any successor to Western and, accordingly, binding upon American in the event the merger is consummated. American took the position before the CAB and takes the position here that Western's collective bargaining agreements will not be binding upon it following the merger.   It contends that the agreements, fairly construed, do not call for survival of the agreements in the event of a merger.   Second, American asserts that Western's collective bargaining agreements will terminate upon the consummation of a merger by virtue of federal law since survival of the agreements would result in American's having to treat with a minority union in violation of national labor policy.

By letter dated February 5, 1971, approximately two weeks before the mailing of the proxy statements, the Teamsters filed a grievance with Western alleging that Western had violated the Western-Teamsters agreements "by consummating an agreement of merger with American  . . .  which fails to provide that these agreements shall be binding upon American, as successor or assign of the company [Western], for their duration."   By letters dated May 14 and May 19, 1971, subsequent to the mailing of the proxy statements, the Western pilots' Master Executive Counsel and stewardesses' Master Executive Counsel respectively filed grievances with Western, each alleging that Western had violated the pilots' and stewardesses' collective bargaining agreements "by failing to provide and assure that the Association-Western collective bargaining agreements shall be binding upon American Airlines in the proposed merger."   Western's obligation to arbitrate these grievances was the subject of a separate declaratory judgment action brought by Western in the Federal District Court for the Central District of California.   That court has recently ordered that arbitration proceed.

## II.  THE PROXY STATEMENTS AND THE RESPECTIVE POSITIONS OF THE PARTIES

The merger agreement, which was attached to and incorporated in the proxy statements, contains the standard clause required by Section 259 of the Delaware Corporation Law, 8 Del.C. § 259:

"On the effective date of the merger, all the rights, privileges, power and franchises  . . .  of each of the Constituent Corporations shall be possessed by  . . .  [American], subject to all the restrictions, disabilities and duties of each of the Constituent Corporations  . . .  and all debts, liabilities and duties of the respective Constituent Corporations shall upon

the effective date of the merger attach to [American], and may be enforced against it to the same extent as if such debts, liabilities and duties had been incurred or contracted by it."

Both proxy statements, in the context of a summary of the terms of the merger agreement, also contain a statement to the effect that American will assume the debts, liabilities and other obligations of Western.

The proxy statements, in customary fashion, included a description of the business and property of each of the two companies. Each description included a subsection entitled "Employees" which disclosed the number of employees in the company; the number of employees represented by unions; the fact that, with one exception, the employees of the company were represented by unions different from those representing the employees of the other company; the existence of collective bargaining agreements with various employee groups and the dates upon which they would become "open for amendment"; and the fact that the company was currently negotiating the terms of one or more "open" agreements.

The merger agreement itself contained the following provisions:

"All the employees of the Constituent Corporations on the effective date of the merger will become employees of the Surviving Corporation. Thereafter, in case of a reduction in the number of employees, equal opportunity for employment in the available positions will be afforded to qualified employees of both of the Constituent Corporations, giving consideration to experience, length of service and ability, as determined by the Surviving Corporation. The Surviving Corporation will also accept reasonable labor protective provisions prescribed by the Civil Aeronautics Board, which may provide, among other things, for allowances for certain employees who may be displaced or dismissed as a result of the merger.

Group insurance benefits and retirement benefits for service with each of the Constituent Corporations prior to the effective date of the merger will be provided under the existing plans of such Constituent Corporation. Group insurance benefits and retirement benefits for service with the Surviving Corporation on and after the effective date of the merger will be provided by plans of the Surviving Corporation that will not discriminate against any employees on account of their former employment by one rather than the other of the Constituent Corporations."

Plaintiffs allege that the statement that American would assume all of the obligations of Western was false and misleading because American at the time did not intend to assume the obligations of the Western collective bargaining agreements.[1] Plaintiffs further allege that the proxy statements were misleading in that they failed to disclose that: (1) American did intend to assume the obligations of the Western collective bargaining agreements; (2) this refusal would embroil the surviving corporation in arbitration, litigation and/or other legal proceedings with their attendant expense; (3) the result of such arbitration, litigation or other legal proceedings might be (a) that American would have to assume the obligations of the Western collective bargaining agreements and/or (b) that Western and American, as its successor, would be held liable to the unions in damage for breach of the collective bargaining agreements; (4) this refusal would result in substantial labor difficulties with the survivng corporation; and (5) the

---

1. There may be a dispute of fact as to whether American's current position on the survival of the Western collective bargaining agreements had been formulated as of the dates the respective proxy statements were mailed, but I shall assume for present purposes that a decision had been made by American at that time to resist assumption of these obligations.

refusal to assume these obligations might result in loss of patronage and good will for the surviving corporation.

The defendants contend that the general statement regarding assumption of obligations by American was not misleading and that there were no omissions of material fact. They also contend that the complaint must be dismissed because the National Mediation Board has exclusive jurisdiction over union representation disputes under the Railway Labor Act, 45 U.S.C. § 151 et seq.

## III. VENUE AND JURISDICTION WITH RESPECT TO THE WESTERN DIRECTORS

■ The parties agree that resolution of the issue posed by the motion to dismiss on behalf of the Western directors turns upon whether, within the meaning of Section 27 of the Securities Exchange Act, this district is one "wherein any act or transaction constituting the [alleged] violation [of the Act] occurred." 15 U.S.C. § 78aa. As the Court held in Puma v. Marriott, 294 F.Supp. 1116, 1120 (D.Del.1969), this portion of Section 27 "does not require that the violative act or acts form the core of the claim. All that is required is but one act within the forum district which represents more than an immaterial part of the allegedly illegal events." Moreover, we have heretofore held the act committed in the forum district "need not *itself* constitute a violation of the Act in order to establish venue." The question, rather, is whether the act upon which venue is predicated is "an integral part of" or "of material importance to" the commission of the violation. Jacobs v. Tenney, 316 F.Supp. 151, 158 (D.Del.1970);

2. There were 4,903,879 shares of Western outstanding at the time.

3. See also Zorn v. Anderson, 263 F.Supp. 745, 748 (S.D.N.Y.1966) ("sufficient is an act of which all the defendants were the intended beneficiaries"); Bath Industries, Inc. v. Blot, 305 F.Supp. 526, 537 (E.D.Wis.1969); Clapp v. Stearns & Co., 229 F.Supp. 305, 307 (S.D.N.Y.1964).

Dauphin Corporation v. Redwall Corporation, 201 F.Supp. 466 (D.Del.1962).

With respect to the Western directors the violation of the Act alleged here is the solicitation of proxies of Western stockholders to vote upon the merger on the basis of misleading proxy materials. It is conceded by the defendants that 14 individuals and one brokerage house, holding of record a total of 1,639 shares of Western stock, were solicited by mail in Delaware.[2] This alone may establish venue. I do not read the *Puma* case to hold otherwise. I do not need to so hold for present purposes, however.

■ The meeting of American's stockholders was held in Delaware. That meeting was an essential prerequisite to the consummation of the corporate transaction of which the Western directors were seeking approval in their proxy materials. The fact that the Western Directors may not have personally participated in that meeting is not significant in the present context. As the court observed in Levin v. Great Western Sugar Company, 274 F.Supp. 974, 978 (D.N.J.1967):

"... [I]t has been held on numerous occasions that any allegation of a securities act violation is sufficient for venue purposes even as to a defendant who did not commit an act within the district if that defendant is in league with a defendant who did act within the district. . . ."[3]

The fair inference from the facts pleaded in the complaint and the proxy statements incorporated therein is that the solicitation of the respective stockholders of American and Western was a cooperative effort participated in by the Western directors with knowledge of the plans for American's meeting.[4]

4. As is normally the case in a situation of this kind, the Western proxy statement was identical for the most part with the American proxy statement and referred to the fact that the American meeting would be held on the same day as the Western meeting. Additionally, it appears that the solicitation occurred with the knowledge that the transaction would be consummated and would become effec-

It follows under the rules established in the *Puma* and *Dauphin* cases that venue lies in this district and that the service of process upon the Western directors under the "long arm" service provision of the Act gives this court *in personam* jurisdiction over them.

## IV. SUBJECT MATTER JURISDICTION

Plaintiffs are members of unions which are currently involved in a labor dispute with the defendant corporations. Defendants suggest that as members of those unions and as employees of Western plaintiffs have an interest in blocking the merger wholly unrelated to any issue posed by their complaint in this action. I assume, without deciding, that this is true. I further assume, *arguendo*, as defendants also suggest, that the filing of this action may have been motivated in whole or in part by those extraneous interests. But this does not alter the fact that plaintiffs are stockholders of American and Western.

■ The fact that plaintiffs may have a substantial interest other than as stockholders cannot deprive them of the opportunity to assert their rights as stockholders under the Securities Exchange Act. Defendants further argue, however, that this suit, although framed as a securities matter, is in reality a representation dispute over which the National Mediation Board has exclusive jurisdiction and that, to the extent the validity of the proxy statements turns upon the merits of the representation dispute, this court is without jurisdiction. They rely in this regard on Brotherhood of Railway & S. S. Clerks, etc. v. United Air Lines, Inc., 325 F.2d 576 (6th Cir. 1963).

■ Under the view I take of this matter, I need not decide whether the underlying dispute is a representation one [5] because I need not decide the merits of that dispute in order to resolve the issue before me. The relevant inquiry, in my judgment, does not concern the merits of the underlying controversy, but rather whether the existence of the controversy itself and the consequences which might flow therefrom were material facts for consideration by stockholders in connection with the proposed corporate action and, if so, whether the nature or significance of that controversy has been misrepresented.

In short, I conclude that this court can and should pass upon the issues raised in the complaint without determining the merits of the underlying controversy, be it a representation one or otherwise, and that, accordingly, this court has jurisdiction over this action.

## V. THE ALLEGED FALSE STATEMENT

Plaintiffs rely upon Section 10(b) and Rule 10b–5 as well as upon Section 14(a) and Rules 14a–3 and 14a–9. While there may be instances where application of one or the other of these provisions will produce differing results,[6] neither side here maintains that it will be any better or worse off depending upon which of these sections or rules are applied. Both characterize the critical issue as being whether the proxy materials (1) contained any statement

---

tive only upon the filing of the merger agreement in Delaware. I need not decide, however, whether this would be sufficient to establish venue prior to the actual filing.

5. Defendants' brief does not distinguish between the question of whether it could lawfully treat with ALPA and the Teamsters following the merger and the question whether some or all of Western's obligations to Western employees under the Western collective bargaining agreement will be binding upon American fol-

lowing the merger. For jurisdictional purposes, these questions may be so intertwined that the distinction has no legal significance. The court in the *United Air Lines* case seems to have so concluded. There are suggestions in the cases to the contrary, however. *E. g.*, Air Line Employees Association v. CAB, 134 U.S.App. D.C. 185, 413 F.2d 1092, 1094 (1969).

6. See discussion in Gould v. American Hawaiian Steamship Company, 319 F. Supp. 795, 800–802 (D.Del.1970).

which, at the time and under the circumstances under which it was made, was false or misleading with respect to any material fact or (2) omitted to state any material fact necessary in order to make the statements therein not false or misleading. With respect to materiality, both sides rely upon the standard set forth in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970):

> "Where the misstatement or omission in a proxy statement has been shown to be 'material,' as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a)." (Footnote omitted, emphasis in original)

This, however, is where the agreement among the parties ends. Accordingly, given these controlling standards, I turn to each of the plaintiffs' contentions.

■ I conclude that plaintiffs place too much emphasis on the general and standard statement that the surviving corporation will assume all of the obligations of the constituent corporation whose existence will terminate upon the merger. The fair reading of this statement in the context of this case is that American will assume all obligations of Western which are valid and do not expire on or before the date of the merger by reason independent of the merger agreement or the merger *per se*. It would not be reasonable to construe the statement as a representation that the corporation will assume contracts which terminate upon a merger by virtue of their own express terms. By the same token, it would not be reasonable to interpret this statement as a representation that the surviving corporation will assume contracts which terminate upon a merger by virtue of the operation of law. Accordingly, the general statement of assumption is not inconsistent with American's current position with respect to Western's collective bargaining agreements (a) that the successors and assigns clause does not apply to a merger situation and (b) that the collective bargaining agreements will be extinguished by federal law under the circumstances of this case upon consummation of the merger.

The record contains nothing which would indicate that this general statement of assumption, as so construed, is false or misleading. Nor is it rendered misleading by the omission of a statement of American's intention to resist assumption of the Western contracts. In short, a statement of this character is not a representation by a constituent corporation with respect to the validity or invalidity of any claim. Here, if American turns out to be right in its legal position, the Western contracts will not have been an obligation of Western upon the consummation of the merger and the refusal to assume will not have been inconsistent with the general assumption statement. If American turns out to be wrong on its law and is required to honor the provisions of the Western agreements, the situation will similarly not be inconsistent with the general statement of assumption.

■ This does not end the matter, however. As previously noted, the existence of a controversy and the possible liability and other collateral effects which it may produce may in themselves be material facts of which stockholders should be made cognizant. American and Western's proxy statements contain references to labor matters and to contingent liabilities. If those proxy statements have omitted to state material

facts regarding the underlying controversy and the effects thereof and such omitted facts were necessary in order to make the proxy statement as a whole not false and misleading, plaintiffs have a cause of action.[7]

## VI. THE ALLEGED MATERIAL OMISSIONS

### 1. *Omission Of A Statement Of American's Position On Contract Survival.*

As heretofore indicated, I have determined that the omission of a statement of American's intention to resist assumption of the obligations of the Western collective bargaining agreement did not render the general statement of assumption false or misleading. I further conclude that this omission does not render any other statement in the proxy materials materially misleading unless it can be said that the foreseeable consequences of American's taking this position were such that facts of the underlying controversy, if more fully disclosed, would have had a significant propensity to affect the voting process. Accordingly, I turn to plaintiffs' contentions regarding the consequences of American's position.

At this stage the evaluation of plaintiffs' contentions must be in the context of Rule 56. As this court observed in Gould v. American Hawaiian Steamship Company, 319 F.Supp. 795, 803 (D.Del. 1970):

"Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The burden of producing undisputed evidence that entitles a party to summary judgment is on the movant, and the party opposing the motion 'is entitled to all favorable inferences which can be drawn from the evidence.' . . . Thus, if the facts are not in dispute, the question arises whether the inferences that can be drawn from those facts point to only one conclusion—in favor of the moving party; otherwise, the motion for summary judgment must be denied."

On the other hand, a party resisting a motion for summary judgment does have a burden of coming forward with competent evidence showing that

---

7. With two exceptions, plaintiffs, in their argument about omissions, do not point to specific language in the proxy statements rendered misleading by the omissions. Rather they contend that the omissions rendered the proxy materials as a whole false and misleading because they falsely implied there were no potential, material problems arising from the labor dispute when in fact there were. The first exception is the general statement of assumption. The only other specific language to which plaintiffs point as being rendered misleading by the omissions is the list of existing Western collective Bargaining agreements. This list included a date (ranging from July 1, 1971 to October 1, 1972) upon which each would "become open for amendment" under the Railway Labor Act, and a statement that renegotiation of the open pilots' contract had reached an impasse, that the parties were in a statutory "cooling off" period. and that the pilots would be free to strike thereafter. I conclude that the statement of dates, by itself, was not rendered misleading by the failure to include a statement of American's position on contract survival. The contracts and their duration were part of the required general description of Western's business as of the date of the proxy materials. Since there was no way of determining when the required approvals would be approved, it was possible that Western, before the merger, would be required to negotiate with various unions after the contracts became open for amendment. I reach the same conclusion with respect to the reference to the possible strike. As hereafter indicated, the alleged omissions did not relate to a situation which realistically had the same potential.

there is a "genuine issue for trial." Rule 56(e) provides in part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Since the proxy materials must be judged in light of the circumstances as they existed on February 19th and 22nd, 1971, when the respective proxy statements of American and Western were mailed, a preliminary review of the situation at that time is appropriate.

Prior to February of 1971 the respective managements of American and Western had considered and discussed the potential personnel relations problems inherent in the proposed merger. In the words of Western's President, "It was recognized . . . by all concerned that because of the difference in unions the smooth consummation of the merger in terms of labor problems would be more difficult."

In December of 1970, Western's President and the Chairman of its Board had conferred with a representative of the ALPA regarding the possible impact of the projected merger upon Western's pilots. The ALPA representative wrote to Western on December 16, 1970 summarizing the position of the ALPA. The letter reads in part as follows:

"As I briefly mentioned to you during our conversation, I am quite confident that the two pilot groups, Western and American, can jointly resolve the problems associated with the integration of their separate seniority lists into one combined document. This will not be an easy task, however, as we lack the common merger policy and procedures which would bind both groups were we both represented by the same bargaining agent. In an effort to bridge that gap, representatives of the Western pilots, in a meeting last Friday, proposed to representatives of the American pilots a simple and orderly set of procedures for both groups to follow to eventually arrive at a fair and equitably integrated joint seniority list. We anticipate a response to our proposal within the next few weeks and should we encounter any insurmountable difficulties in our attempt to establish a framework under which both pilot groups can work out their seniority problems, I will advise you promptly.

Ensuring the survival of the Western Pilot Employment Agreement until it has been successfully merged with the American Agreement into one new employment contract through joint negotiations of all affected parties is of paramount importance to all Western pilots. Every Western pilot has certain employment rights which must continue under the Western contract until a merged Employment Agreement is achieved. . . .

For our part, we intend to make every reasonable effort to reach agreement promptly in the negotiation meetings which commenced on December 9. If we can reduce to writing our mutual understanding that the Agreement we are now negotiating, as well as the seniority and other rights which flow from that Agreement, will not be left unprotected as of the effective date of any projected merger, I feel quite certain that our efforts to resolve other open items will be equally successful."

The record reveals no further communication, report or protest from the ALPA to Western or American prior to the mailing of the proxy statements.

As previously noted, the Teamsters filed a grievance by letter of February 5, 1971, addressed to Western. This grievance does not assert the post-merger survival of the Western collective bargaining agreements. Rather, it alleges that Western had violated the successor

and assigns clause of Article III of each of the agreements "by consummating" an agreement of merger with American which failed to provide that the agreement would survive and be binding upon American. In order to understand the significance of this grievance it is necessary to refer to a prior dispute involving the Teamsters which arose in the context of a merger tetween Trans Caribbean Airways, Inc. ("TCA") and American.

On January 21, 1970, American entered into a merger agreement with TCA calling for the merger of TCA into American. The Teamsters represented certain employees of TCA. The Teamster-TCA collective bargaining agreements contained a successor and assigns clause as well as additional language requiring TCA to give notice of any potential merger and to require of the successor that it assume the obligations to the union and its members contained in the collective bargaining agreements. A grievance filed by the Teamsters against TCA resulted in an award, dated October 26, 1970, and known as the Gamser Award. The award found that TCA violated the collective bargaining agreements by failing to provide the union with notice and by failing to require American to assume the agreements upon entering into the agreement of merger. It required TCA to post bond "in a sum sufficient to provide assurance of recovery of such direct and consequential damages as the union or its members may suffer as a result" of the breach "over a reasonable period of time after the consummation of the merger." This award was subsequently upheld on February 24, 1971, by the United States District Court for the District of Columbia.

Two further matters must be noted to round out the picture as it existed in February of 1971. First, the labor relations of American and Western, as air carriers, are regulated under the Railway Labor Act. Second, the proposed merger could be consummated only with the approval of the CAB.

Three of the express purposes of the Railway Labor Act are (1) to avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules or working conditions; and (3) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions. 45 U.S.C. § 152.

In order to promote these purposes the act imposes upon all carriers, their officers, agents and employees the "duty" to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof. 45 U.S.C. § 152, First.

The Act then goes on to establish an elaborate system of procedures for the orderly resolution of disputes. The Teamsters' grievance of February 5, 1971, invoked these procedures and the dispute reflected in the grievance is currently being arbitrated. While such procedures are being pursued, strikes and other activity inconsistent with the above-quoted duty imposed upon the carrier and its employees are in violation of the Act and may be enjoined.[8]

---

8. Section 153 provides for the resolution of disputes and grievances, like the Teamster grievance here, arising out of existing collective bargaining agreements (known as "minor disputes") through negotiations between the carrier and the union with decision ultimately to be made by the Railway Adjustment Board or the Systems Board of Adjustment established by the carrier and the union jointly. The parties may be enjoined from turning away from the ordained channels for the

The required approval of the CAB is also a significant part of the picture as it existed in February of 1971, because the CAB has consistently considered the impact upon labor of proposed air carrier mergers as a relevant factor in its decision and has consistently imposed what are known as "labor protective provisions" as a condition of its approval. In the last ten years some sixteen airline mergers have been approved by the CAB and in each instance the CAB has conditioned its approval upon acceptance by the surviving carrier of labor protective provisions in the form adopted in the United-Capital Merger Case, 33 CAB 307, 323–331 (1961). The United States Court of Appeals for the District of Columbia has described these provisions as follows:

"The labor protective provisions, set forth by the Board in its decision in the United-Capital Merger Case, 33 C.A.B. 307, 342–347 (1961), provide generally that employees shall be no worse off after a merger than before, that costs to employees arising out of the merger shall be paid by the company, and that where employees are dismissed because of the merger, 'dismissal allowances' shall be paid to them based upon their seniority. The provisions further permit arbitration of disputes arising out of the application of their terms at the request of either party."

Plaintiffs here correctly assert that these labor protective provisions do not, at least expressly, cover all employee benefits. They do, however, cover, among other things, the critical areas of seniority rights and compensation:

"Section 3. Insofar as the merger affects the seniority rights of the carriers' employees, provisions shall be made for the integration of seniority lists in a fair and equitable manner including, where applicable, agreement through collective bargaining between the carriers and the representatives of the employees affected. In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with section 13.

Section 4(a). Subject to the applicable conditions set forth herein, no employee of either of the carriers involved in the merger who is continued in service shall as a result of the merger be placed in a worse position with respect to compensation than he occupied immediately prior to the effective date of such merger so long as he is unable in the normal exercise of his seniority rights under existing agreements, rules, and practices to obtain a position producing compensation equal to or exceeding the compensation of the position held by him immediately prior to such date. . . ."

The significance of the CAB labor protective provisions for present purposes is highlighted by a recent observation of a CAB Hearing Examiner following the hearing on the proposed Allegheny-Mohawk merger:

". . . the Board's standard labor conditions have been singularly successful in that there has never been a work stoppage or strike under the

---

mandatory adjudication of such disputes. Brotherhood of Locomotive Engineers v. Missouri-K.T.R. Co., 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960). Section 156 deals with disputes arising from conflict over negotiation of new provisions or matters outside of existing agreements (known as "major disputes"). For major disputes Congress did not adopt a compulsory system of arbitration, but rather established channels for negotiation and conciliation whose use is made mandatory. For a full discussion of the required and lengthy procedures, involving notice and cooling off periods as well as mediation by the National Mediation Board, see Pennsylvania R.R. Co. v. Transport Workers Union, 202 F.Supp. 134 (E.D.Pa.1962). The federal courts have the authority and duty to enjoin resort to self-help before the parties have exhausted these mandatory procedures of conciliation and mediation. Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); American Airlines, Inc. v. Transport Workers Union, 202 F.Supp. 806 (S.D. N.Y.1962).

United-Capital conditions." [9] Recommended Decision of Examiner Merritt Ruhlen, Allegheny-Mohawk Merger, Docket 23371, October 29, 1971 at p. 19.

2. *Omission Of A Statement That The Controversy Over Western's Collective Bargaining Agreements Might Involve The Companies In Litigation, Arbitration And Other Proceedings Requiring The Expenditure Of Funds.*

■ As of the mailing of the proxy statements, the only pending or threatened legal proceeding concerning the Western agreements of which Western and American had notice was the Teamsters grievance claiming damage from Western for breach of contract.[10] Any statement at that point regarding the possibility of other proceedings would have been wholly speculative and was not required.

Legal proceedings and legal expenses are facts of business life. Given the undisputed size of these constituent corporations, their income and their operations, as well as the extablished procedures for resolving grievances in this industry, I conclude that a stockholder does not "set forth facts showing there is a genuine issue for trial" merely by showing the existence of a single grievance proceeding. The record facts make it a virtual certainty that the Teamster grievance will not require the expenditure of funds in an amount which would have a material impact on the financial position of the two companies. There is

no evidence from which the court could draw a contrary inference. Summary judgment would, accordingly, be appropriate as far as this issue is concerned.

3. *Omission Of A Statement That Possible Legal Proceedings Might Result (a) In The Surviving Corporation's Having To Assume The Obligations Of The Western Collective Bargaining Agreements Or (b) In Western, And Accordingly American, Being Liable For Damages To Western's Employees And/Or The Unions.*

(A) *The possible survival of the Western agreements.*

■ Plaintiffs' argument concerning the omission of a statement that American might have to assume the obligations of the Western agreement is somewhat inconsistent with its position regarding the general assumption clause in the proxy statements, since they assert that the effect of the statement in fact made was to lead a stockholder to believe that the obligations of the Western agreements would be assumed by the surviving corporation. I understand plaintiffs to argue, however, that if the general statement of assumption is construed as something other than a representation that the Western agreement would be assumed, the proxy materials are deficient in failing to call the stockholders' attention to economic burdens those agreements would place upon the surviving corporation. They allege in this regard that the agreements "consti-

9. In recent hearings conducted in connection with CAB approval of airline mergers, including the hearings on the American-Western and Allegheny-Mohawk mergers, requests for modification of the United-Capital labor protective provisions have been made. All appear to have been made by parties seeking to strengthen the provisions rather than to dilute them. The reasonable expectation in February of 1971 was that labor protective provisions no less stringent than the United-Capital ones would be required as a condition of CAB approval of the American-Western merger.

10. The February 5th grievance was not notice to Western and American of what appears to be the Teamsters' present position that the contracts will survive. If any inference could be drawn from that grievance with respect to the survivability of the contracts, it would be that they do not survive since Western's failure to require survival is the basis of the alleged damage claim. While the ALPA had taken the position that American should recognize the contract obligations during a transitional period. it had not threatened suit or other legal proceedings.

tute obligations of Western in an amount in excess of $44,000,000 per year." [11]

The impact of operating expenses of the constituent corporations upon the surviving corporation is a matter of prediction involving many factors. One accepted way of allowing investors to evaluate this matter is through financial statements of the operating histories of the respective companies and through a *pro forma* combined statement of operations. Such financial statements were included in the American-Western proxy statements as was a statement that all employees of Western would become employees of American. Assuming the survival of the Western agreement, these materials provided a satisfactory basis for stockholder evaluation of the proposed merger insofar as operating costs are concerned.

A further word is necessary, however. Plaintiffs, in addition to criticizing the companies for not stating that American might have to assume the obligations of the Western contracts, also criticize the companies for not stating that American might not have to assume those obligations. While this position is not necessarily internally inconsistennt as defendants suggest, it must be kept in mind that we are here concerned with whether stockholders were provided an adequate basis for the exercise of their franchise. The relevant question, accordingly, is the economic impact that different resolutions of the underlying dispute might have on the profitability of the surviving corporation. The fact is that there is no evidence in this record which would tend to indicate that the labor expenses of the surviving corporation will be materially different whichever way the controversy is resolved.

It is undisputed that labor protective provisions of at least the scope of the United-Capital labor protective provi-

sions were a virtual certainty as of the time of the mailing of the proxy statements. It is also undisputed that American's policy was then and is now that "in the aggregate, the rules, rates of pay and working conditions of the Western people [will] be no less than they enjoyed as Western Air Lines employees." Plaintiffs do not contend that the labor expenses of the surviving corporation with respect to the Western employees will be greater if they are covered by the American contracts after the merger than if they are covered by the Western contracts. In short, the financial statements provided stockholders with a basis for evaluating the merger assuming there is no material change in the labor expenses attributable to the present Western employees. As of February 1971 there was no reason to anticipate any such material change. I conclude, as before, that it was plaintiffs' obligation to come forward with some competent evidence that the labor expenses of the surviving corporation would be materially different depending upon whether the obligations of the Western collective bargaining agreements survived. They have not done so.[12]

(B) *The possible liability for damages to employees and/or unions.*

So far as damages to employees are concerned, defendants maintain that there were no reasonably foreseeable damages to employees in any amount, much less an amount material in the context of this merger. They rely upon the labor protective provision guarantees of similar treatment in most respects and upon the affidavit of Charles I. Hopkins, Jr., Vice President of American—Personnel, that, upon the merger, (1) former Western employees will be covered by American's agreement with

11. This figure is apparently the total payroll of Western's union employees.

12. Plaintiffs have not filed an affidavit under Rule 56(f) asserting that they lack access to necessary evidence. The affidavits filed by them affirmatively indicate that they have access to the information necessary to compare the American and Western collective bargaining agreements.

TWU, (2) American agreements provide many benefits superior to the benefits under the Western-Teamster agreements and, (3) in the aggregate, Western employees will not be deprived of benefits upon consummation of the merger.[13]

Plaintiffs have responded with affidavits of the Secretary-Treasurer of the Teamsters which state that (1) the Western-Teamsters hospitalization, medical and dental plans are better from the employees standpoint than the American-TWU plans, and (2) that the former dispatchers of TCA were not entitled to past service credits under the American Airlines pension plan upon consummation of the TCA-American merger. These affidavits, however, do not raise a material dispute of fact. In the event damages are ultimately awarded to the employees as a result of the February 5th grievance, the measure of damage would have to be the difference, if any, between the monetary value of the total compensation and fringe benefits which the employees would have received if Western had insisted upon American's assuming these obligations and the monetary value of the total benefits received by former Western employees under the American-TWU agreements. The Labor Protective Provisions and the Hopkins' affidavit indicates that no material difference will exist. There is no competent evidence in the record from which this court could draw a contrary inference.

With respect to pension plans, the TCA-American situation provides no precedent here[14] and the merger agreement itself assures that Western employees will neither lose pre-merger accrued rights under the Western plan nor be discriminated against in the post-merger operation of the American plan.

With respect to the possibility of liability for damages to the Teamsters, the only liability suggested by plaintiffs is possible liability for dues under the check-off provisions of the contracts.[15] No claim for lost dues has been asserted under the Gamser award and neither the research of the parties or the court has produced any precedent for such a claim. I shall assume for present purposes, however, that if it were ultimately determined that the contracts terminate and that Western breached the contracts, Western, and American as its successor, might be liable for this type of damage.

As above indicated, the only pending or threatened claim of which the defendants had notice in February of 1971 was that of the Teamsters.[16] The only record evidence on the point indicates that the Teamsters receive dues from Western at the rate of approximately $240,000 per year. A Teamsters' affidavit suggests that "a reasonable period of time after the consummation of the merger" within the meaning of the Gamser award, would be five years,

---

13. This conclusion is supported in the Hopkins' affidavit by comparison between the TWU-American agreement and the Teamster-Western agreement as they relate to twenty categories of employee benefits ranging from compensation and working conditions to time off and health and insurance benefits.

14. Trans Caribbean did not at the time of the merger have a company pension plan covering these dispatchers, but instead contributed to a Teamsters Plan which provided that persons lose all equity or any right to benefits under that Plan unless they retire from a position in which they are represented by the Teamsters. On the other hand, the Western employees now represented by the Teamsters are covered by the Western Retirement Income Plan, and that Plan in no respect requires representation by any union for any person to retain his equity in the Plan or eligibility for benefits under the Plan.

15. If the contracts survive, of course, the dues will be checked off as provided in the contract and there will be no effect on the operating expenses of the surviving corporation.

16. In February of 1971, the ALPA had not asserted such a claim and had not pursued a damage remedy in the TCA merger. The other union in the same position, the Brotherhood of Railway, Airline and Steamship Clerks, etc., has not in the past, and does not now, assert that they will pursue such a claim.

making a total of $1,200,000 in lost dues. This, of course, is a gross amount. The expenses of representation of which the Teamsters would have been relieved by Western's breach of contract would have to be deducted and the net figure would have to be discounted. Giving the union every benefit of doubt, the most that can be said is that the companies in February of 1971, had knowledge of a contingent liability to the Teamsters in an amount substantially less than $1,000,000. This was not a material contingent liability in the context of this transaction.

It is, of course, apparent that a proxy statement cannot, and should not, list all contingent liabilities regardless of size. There is no case law suggesting an appropriate standard for determining which contingent liabilities are material, but the Securities and Exchange Commission has suggested a standard in a somewhat comparable situation. Its instructions with respect to S–1 registration statements requires that the registrant "briefly describe any material pending legal proceedings, other than ordinary routine litigation incidental to the business." It then states:

"No information need be given with respect to any proceeding which involves primarily a claim for damages if the amount involved, exclusive of interest and costs, does not exceed 15% of the current assets of the registrant and its subsidiaries on a consolidated basis."

The purpose of Item 12 is to provide investors with information concerning material pending legal proceedings in order to permit an informed evaluation of the issuer's business. The purpose of a proxy statement is similar. I do not suggest that Item 12 is a firm yardstick by which to judge all questions arising under the law regulating proxy statements. I cite it for the purpose of indicating that this is not a close case so far as materiality is concerned. Fifteen percent of the combined current assets of American and Western, calculated from the *pro forma* combined balance

sheet appearing in the proxy statement, was approximately $56,400,000. By this comparison, or by any other comparison related to operation expense or earnings, a contingent liability of substantially less than $1,000,000 was not material in the context of this transaction.

### 4. *Omission Of A Prophecy Of Labor Difficulties.*

The complaint alleges that the proxy statements "falsely and misleading . . . [imply], by failure to disclose, that there is no threat of labor difficulties to American involving Western labor agreements arising out of the proposed merger, if consummated, and out of American's undisclosed intention not to assume Western's labor agreements." Plaintiffs' brief in arguing this point states:

"Merging two companies, particularly companies as complex as major airlines, is not easy in the best of circumstances and it takes time for the benefits and economies to be realized. The addition of significant labor problems greatly complicates this task."

The proxy statements made it clear that the proposed merger involved the integration of two major airlines. It further revealed that a majority of the employees of each of the constituent corporations were represented by different unions. The managements of the two corporations recognized, and might have gone on to state, that because different unions were involved, smooth consummation of the merger might turn out to be more difficult than if the same unions were involved. I conclude, however, that this was neither necessary nor desirable. The critical fact was that different unions were involved. This was stated and the stockholders were left to evaluate that fact for themselves. For management to speculate further on the significance of that fact might well have misleadingly implied to the stockholders, contrary to fact, that management had reason to believe the merger was likely to produce labor disputes which would

materially affect the operations of the surviving corporation.

I reach the same conclusion with respect to plaintiffs' suggestion that the proxy materials should have included a statement that American's position with respect to contract survival might complicate the matter of integration. It is not at all clear from the record that American's position is likely to have a complicating affect, but I shall assume for present purposes that it might make the concededly difficult task of integration somewhat more difficult. Even so, the inclusion of a statement to that effect was neither necessary nor desirable in a context where, concededly, there had not been a work stoppage or strike in similar circumstances in the preceding ten years.

In short, while it was reasonably foreseeable that such things as the integration of seniority lists might prove more difficult because of different representation, and perhaps because of American's position on contract survival, it was not reasonably foreseeable, in light of the Railway Labor Act, the CAB protective provisions, and the machinery thereunder for the peaceful resolution of disputes, that these difficulties would produce significant disruptions in the operations of the surviving corporation. This, in my judgment, is what should concern those preparing and reading proxy materials. Plaintiffs, as employees of Western, may well be genuinely concerned about contract survival for personal reasons. As stockholders, however, their sole interest is in matters which may materially affect the surviving corporation.

In support of their argument, plaintiffs refer once again to the TCA-American merger situation. They have submitted affidavits to the effect that the integration of the TCA and American pilots has proved difficult and that these difficulties have resulted in the furlough of some 46 TCA pilots and ultimately in the picketing by those pilots of several American locations. This picketing, however, did not commence until November 5, 1971. While these affidavits are evidence from which this court could infer that the matter of integration of seniority lists created problems in a comparable situation and perhaps even that the failure to recognize the survival of contracts complicates the matter, they do not provide evidence from which this court could conclude either that there was a material disruption of operations in the TCA-American situation or that such material disruptions were reasonably foreseeable in the American-Western situation as of February of 1971.

5. *Omission Of A Statement Regarding Potential Loss of Patronage And Good Will.*

Although not alleged in their complaint, plaintiffs resist the motion for summary judgment on the further ground that the proxy statements omitted to state that American's position with respect to the survival of the Western contracts might result in loss of patronage and good will of the surviving corporation. They assert that "a stockholder, if he has any awareness of the world about him cannot help but be interested in the possible effects on airline customers of a labor dispute, or even of the airline's reputation for being hardnosed in its labor relations." They point further to the fact that vast investment funds in today's securities markets are controlled by union pension funds and others interested in the social effect of business practices.

A labor dispute may have an effect on potential customers and investors. If it comes to their attention, some may sympathize with one side or the other. The net effect, if any, however, is difficult if not impossible to predict. I do not believe those who solicit proxies either must or should speculate on the matter. Nor do I believe that, in the absence of special circumstances not here present, it is feasible to require the inclusion in proxy materials of all facts necessary to provide a basis for informed speculation by those stockholders who may be inter-

ested in the possible social effects of business practices.

The motion of Western's directors to dismiss for want of venue and jurisdiction will be denied. The motion of all defendants for summary judgment will be granted.

Submit order.